IN THE UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

Peter David Schiff,
Plaintiff,

CIVIL ACTION NO. [_____] Case Number 24-1511
COMPLAINT
(Jury Trial Requested)

v.

INTERNAL REVENUE SERVICE (IRS), the revenue service for the United States federal government

JIM LEE, in his personal and official capacity as former IRS Chief of Criminal Investigations

Unnamed IRS agents that will be named upon further discovery functioned as co-conspirators.

OFFICE OF THE COMMISSIONER OF FINANCIAL INSTITUTIONS OF PUERTO RICO (Hereafter OCIF by its Spanish name "Oficina del Comisionado de Instituciones Financieras"), main financial regulator for the international banks in Puerto Rico.

Unnamed OCIF employees that will be named upon further discovery but functioned as co-conspirators.

NATALIA ZEQUEIRA DÍAZ, in her personal and official capacity as OCIF Commissioner,

WIGBERTO LUGO, in his official capacity as the OCIF Trustee,

All members of the J5: a Joint Chiefs of Global Tax Enforcement organization

a)      Internal Revenue Service, Criminal Investigation (IRS-CI) – United States of America (also acts as the J5 leader of sort)

b)      Mr. Will Day in his personal and official capacities as Australian Taxation Office (ATO) representative– Australia. ATO is an Australian statutory agency and the principal revenue collection body for the Australian Government

c)      Mr. Eric Ferron, in his personal and official capacities as Canada Revenue Agency (CRA) representative– Canada, CRA is the revenue service of the Canadian federal government

d)      Mr. Niels Obbink, Fiscale Inlichtingen- en Opsporingsdienst (FIOD) – Netherlands. FIOD is an agency of the government of the Netherlands responsible for investigating financial crimes.

e)      Mr. Simon York in his personal and official capacities as His Majesty's Revenue and Customs (HMRC) representative – United Kingdom. HMRC is a non-ministerial department of the UK Government responsible for the collection of taxes.

1

Mathew Goldstein of the NY Time, a New York Times Business reporter focusing on white collar crime.

The NY Time newspaper, an American daily newspaper based in New York City.

Charlotte Grieve, an investigative journalist with The Age newspaper Australia.

Nick McKenzie an investigative journalist of The Age newspaper in Australia

The Age, newspaper, daily tabloid newspaper in Melbourne, Australia

Defendants.


1) Introduction
   a) This is a civil rights action seeking redress for damages arising from the wrongful and negligent conduct of the defendants, which resulted in financial and reputational harm to the Plaintiff. The actions of the IRS and OCIF deprived the Plaintiff of property without due process, in violation of the 4th, 5th, and 14th Amendments. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1332, as federal questions related to IRS actions and also, diversity of citizenship exist, with the amount in controversy exceeding $75,000. The Plaintiff claims violations of 42 U.S.C. §§ 1983 and 1985(3) due to alleged conspiracy between the defendants: a) violation of 42 USC 1983 – violation of Plaintiff's constitutional due process rights under 4th and 5th Amendments and to Equal Protection under 14th Amendment, and b) violation of 42 USC 1985(3) – alleged conspiracy to violate Plaintiff's constitutional rights by Defendant Ms. Zequeira and co-conspirator Mr. Lee and unknown others at IRS/J5 and OCIF. The plaintiff is a member of a protected class. The action has an independent claim under Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971) for violation of his Civil Rights -Due Process and Unlawful Seizure of Property (Fifth Amendment).


2) Parties
   a) Plaintiff: Peter David Schiff, a U.S. citizen, and resident of Puerto Rico for more than seven years.
   b) Defendants:
      i) IRS: Federal agency responsible for tax collection and enforcement.
      ii) Mr. Jim Lee: former IRS Chief of Criminal Investigations, sued in his personal and official capacities. Resident of Washington DC USA
      iii) Unnamed IRS agents that will be named upon further discovery and functioned as co-conspirators.
      iv) OCIF: A Puerto Rico government agency regulating financial institutions.

    v) Ms. Natalia Zequeira Díaz: OCIF Commissioner, sued in her personal and official capacities.

    vi) Unnamed OCIF employees that will be named upon further discovery and functioned as co-conspirators.

    vii) Mr. Wigberto Lugo: OCIF Trustee, sued in his official capacity.

    viii) J5: a Joint Chiefs of Global Tax Enforcement organization committed to combatting transnational tax crime through increased enforcement collaboration. Their work together to gather information, share intelligence, conduct operations, and build the capacity of tax crime enforcement officials whose individual members are:

        (1) Internal Revenue Service, Criminal Investigation (IRS-CI) – United States of America (also acts as the J5 leader of sort)

        (2) Mr. Will Day in his personal and official capacities as Australian Taxation Office (ATO) representative– Australia

        (3) Mr. Eric Ferron, in his personal and official capacities as Canada Revenue Agency (CRA) representative– Canada

        (4) Mr. Niels Obbink, Fiscale Inlichtingen- en Opsporingsdienst (FIOD) – Netherlands

        (5) Mr. Simon York in his personal and official capacities as His Majesty's Revenue and Customs (HMRC) representative – United Kingdom

    ix) Mathew Goldstein, Business reporter of the N.Y. Times.

    x) The NY Times, Newspaper in NY.

    xi) Charlotte Grieve, Journalist of The Age in Melbourne, Australia.

    xii) Nick McKenzie, Journalist of The Age in Melbourne, Australia.

    xiii) The Age in Australia, newspaper in Melbourne, Australia

3) Jurisdiction and Venue

    a) This Court has jurisdiction over the claims under 28 U.S.C. § 1331 (federal law) and § 1332 (diversity jurisdiction). Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events occurred in Puerto Rico and all defendants are subject to personal jurisdiction in this district.

4) Factual Background

    a) Mr, Peter Schiff, the Plaintiff (hereafter addressed as "Mr. Schiff" or "the plaintiff") owned a financial institution that was shut down due to OCIF and IRS/J5 alleged conspiracy to pretend that IRS/J5's failed investigation named "Operation Atlantis" against Euro Pacific International bank (hereafter, "the bank") and the Plaintiff was a success.

b) IRS and J5, under the direction of Mr. Lee were, since 2020, engaged in a pattern of lies and deception directed to mislead Plaintiff into believing, as he did until June 30th 2022, that there was no open investigation against him or the bank; for instance, this is shown by the actions of two IRS agents back in Jan 14, 2020 that handled Plaintiff a subpoena clearly stating to produce all documentation "*which you had/have a financial interest in…*"; Plaintiff asked clarification and the agents lied and stated that neither he nor the bank were targets of the investigation. Plaintiff believed the IRS' agents words, since Plaintiff was, although a little suspicious, inclined to believe the IRS was, at its core, an honest agency and, at that moment, there was no evidence of malice from the IRS side; Plaintiff's opinion of the IRS's intended goal started to change when Mr. Jim Lee, acting as representative of both, IRS & J5, finally announced during a widely promoted June 30th, 2022, press conference that the Plaintiff's bank was indeed the target of an investigation. The press conference was held in PR with IRS/J5 and OCIF. The OCIF Commissioner briefly mentioned that the bank was closed due to capital deficiencies, but that message was buried by IRS/J5's abundant, far longer, and deep message about illegal tax evasion and criminal money laundering activities and strong implication that Plaintiff and his bank aided and abetted illegal tax evasion and criminal money laundering activities. Prior to that the only criminal allegations against the bank or Plaintiff came from the media.

    i) It is highly probable that the IRS/J5 was the source of the leak regarding Plaintiff and his bank being the target of the J5 investigation, and of both being guilty of the crimes for which they were being investigated; Mathew Goldstein of the N.Y. Times and Charlotte Grieve and Nick McKenzie of The Age in Australia helped the alleged conspiracy by dispersing both, the existence of the confidential investigation and false claims around the world with malice that the bank and Plaintiff were guilty of illegal tax evasion and criminal money laundering, as well as aiding and abetting illegal tax evasion and criminal money laundering activities on the part of the bank's customers, knowing those claims were false, with the intent to destroy the bank in the media, since the IRS had no legal basis for doing so in court.

    ii) It is believed by the Plaintiff the Australian journalists also had a hand in the IRS pressuring OCIF to shut down the bank and hold the press conference, to use that as evidence to defend against the Plaintiff's defamation lawsuit in Australia, about a month prior to an important hearing on meaning. This belief is based on the fact they introduce that action of the IRS/J5/OCIF as evidence in their defense, including comments made by Mr. Lee and Ms. Zequeira during the press conference.

c) That press conference was incredibly unique as it is the only known public press conference OCIF has ever held. The plaintiff believes that fact further indicates that the entire action was a publicity stunt to help the alleged conspiracy; since, if it was really just about closing a bank that simply lacked sufficient capital, there would have been no

reason to announce that with a widely promoted media press conference, as it was not a significant news story, and the bank did not have a single Puerto Rican customer. In fact, none of the bank's customers were U.S. citizens or even U.S. residents. Plaintiff believes that the conference was all about providing the IRS/J5 with a global forum to falsely accuse the bank of money laundering and tax evasion to validate their Operation Atlantis investigation, turning a failed investigation into a fake success.

d) The IRS lied to Plaintiff in Jan 2020 to gain his confidence, but the IRS/J5 represented by Mr. Lee in Jun 2022 OCIF press conference, partially told the truth to the media and the world at large about an ongoing investigation of the bank; however, by making unrelated and improper statements of illegal tax evasion and criminal money laundering activities, lied by implication about the supposedly real reasons to close the bank and the real outcomes of the investigation, causing intentional confusion in the media to falsely conclude that the bank and Plaintiff where guilty of the crimes for which the press had earlier reported they had been investigated. This included Novo Bank, Euro Pacific Bank's main correspondent bank, which held most of its customers' deposits, as well as the Portuguese Government, which cited the press conference and action against the bank as the reason to freeze Euro Pacific's customers' funds held at Novo bank, to prevent the proceeds of tax evasion and money laundering from being reintroduced into the global economy.  After an eight-month investigation that found no evidence to substantiate any of these allegations, the freeze of the funds was finally lifted.

e) Plaintiff had previously entered into discussions to sell the bank as a stock sale (including the bank's license to operate in Puerto Rico) to Qenta (formerly known as Emergent Technologies), a deal which would have provided Plaintiff with over $17.5 million in cash, gold, and stock in 2022. This mostly stock sale was initially blocked by OCIF on May 16th, 2022, allegedly at the request of the IRS/J5, despite full disclosures having been made about the transaction, Qenta being eminently qualified to own and operate the bank, OCIF Commissioner Zequeira having initially enthusiastically supported the stock sale, and said sale being in the best interest of not only the Plaintiff, but customers, employees, creditors, and Puerto Rico. OCIF offered the bank an opportunity to submit a motion for reconsideration, which the bank timely filed. The three reasons given by OCIF for denial were a simple misunderstanding and some missing information, all of which were fairly easy to correct. Nevertheless, none of those three reasons were lack of capitalization, nor the fact the sale would result in Plaintiff owning stock in Qenta. However, as plaintiff leaned for the first time in April of 2024, OCIF never intended to consider the motion for reconsideration, as the Commissioner had already conspired with the IRS to shut down the bank and set a date in June, 2022 to hold a press conference to announce that action to the world. Had the sale to Qenta been approved as planned, there would have been no basis to hold the press conference, and J5/IRS would not have been able to save face.

i) However, posteriorly OCIF, did approve the sale of the *bank's assets by the bank*, including its customer base, to Qenta anyway, but for a fraction of what Plaintiff would have received had OCIF approved the bank's stock sale (on the date the banks' assets sale was approved, the bank was already in receivership with specific OCIF instructions to the trustee to completely liquidate it). The trustee appointed by OCIF, failed to exert independent judgment, and followed without question OCIF's instructions to approve the bank's assets sale and liquidation instead of its independent fiduciary duty for the bank's customers, creditors, and investors as he should have done. OCIF and the Trustee approved the sale of virtually all of the bank's assets to Qenta for just $1.25 million in cash, or seven cents on the dollar, instead of trying to get the highest possible value for all parties involved, thus also failing to comply with his fiduciary duties. Up to this date, the bank has not yet been liquidated. This delay in liquidating the bank, is still causing further damages to Plaintiff (as any proceeds left after paying banks' liabilities and receivership reasonable expenses would have returned to him) and, it is also causing damages to bank's customers as the available proceeds go first to cover receivership costs and not to pay banks customers' deposits; thus, an imminent and clear conflict of interests between the Trustee and the bank has been created by the delay. Also, since Plaintiff's occupation involves customers trusting him with their money, the unnecessary delay in the return of customer funds continues to damage his reputation among customers, potential customers, and peers, and diminish his earnings capacity.

(1) It is a well-known principle in mergers & acquisitions that an asset sale usually brings less proceeds to the table than a stock sale, as the former normally includes goodwill and other intangibles rights and assets (like, for instance, operating licenses, and management know-how) which cause the overall firm value to be much higher than its individual pieces, sort of a gestalt effect. A financial regulator like OCIF knows or should have known this; thus, it is incomprehensible why such a regulator opted for an asset sale when a far more profitable stock sale was available. Instead, OCIF and the Trustee violated their fiduciary duties by failing to consider transactions that put the bank in the strongest financial position. They should have sought a resolution that provided as much money as possible to achieve their statutory mission to protect the bank's customers and their deposits. Approving the sale to Qenta would have provided the bank with $8 million in additional capital, to fully protect the customer's deposit and fully cover the bank's other liabilities and expenses. A total liquidation in receivership should have been a last resort. A course of action a prudent regulator would only have taken if no better option were available. The action Ms. Zequeira chose was so unnecessarily reckless that Plaintiff believes she must have been guided by an ulterior motive for

choosing it. In fact, shortly after the bank was put into receivership a well-funded investor group headed by a former OCIF Commissioner and former OCIF executives reached out to Ms. Zequeira to buy the bank. They would have infused it with millions of dollars in additional capital to fully protect all customer accounts, fully paid all of the bank's outstanding trade liabilities, and paid several million dollars to the Plaintiff for his shares in the bank. But Ms. Zequeira refused to even discuss their offer. It is believed that her refusal resulted from her conspiracy with the IRS to shut down the bank as a publicity stunt for the J5, rather than act in the best interest of customers, creditors, Puerto Rico, and the Plaintiff.

(a) IRS Chief Jim Lee began his prepared remarks at that conference by stating "four years ago this week" the J5 was formed. Plaintiff believes that the press conference was specifically scheduled to coincide with this anniversary, to commemorate the occasion by announcing the J5's only enforcement "success."

(2) As stated above, is a well-established principle in mergers and acquisitions that an asset sale typically generates less proceeds than a stock sale. This is because an asset sale often includes the sale of real property, personal property, and intangible property but does not include assets such as goodwill and operating licenses, plus the transfer of liabilities associated with the seller's relationship to the property. In contrast, a stock sale involves the transfer of ownership of the entire company, including its assets and liabilities, *Am. Crystal Sugar Co. v. County of Polk, 2009 Minn. Tax LEXIS 16,* which can result in a higher overall firm value. In the case of Shockley v. Comm'r, it was noted that structuring a transaction as a stock sale rather than an asset sale could result in significant cash savings. Specifically, the analysis provided in the case showed that a stock sale could save $11 million compared to an asset sale, highlighting the financial benefits of stock sales over asset sales. *Shockley v. Comm'r, T.C. Memo 2015-113, Shockley v. Comm'r, 872 F.3d 1235.* Furthermore, in the case of Tenneco Inc. v. Enterprise Prods. Co., it was demonstrated that even when an asset sale was initially proposed, the final transaction was structured as a stock sale, which was more advantageous for tax purposes. This case underscores the preference for stock sales in certain scenarios due to the associated financial benefits*. Tenneco Inc. v. Enterprise Prods. Co., 925 S.W.2d 640*. Additionally, the case of Cullifer v. Comm'r explains that buyers generally prefer asset purchases because they can receive a new basis equal to the purchase price, while sellers prefer stock sales to avoid the corporate-level tax triggered by asset sales. This preference for stock sales by sellers is due to the deferral of corporate-level tax liability, which can result in a higher sale price for the stock. This new basis can provide significant tax benefits

to the buyer. On the other hand, sellers typically prefer stock sales to avoid the corporate-level tax that would be triggered in an asset sale. However, the case also notes that because a stock sale merely defers the corporate-level tax liability, it could result in a lower sale price compared to an asset sale for this reason. *Cullifer v. Comm'r, T.C. Memo 2014-208.* **In the current situation, the seller (Trustee) acted contrary to all financial logical reasons as the individual assets sales pays more taxes right away, thus less proceeds left to distribute to the customers and any deferred tax created in a stock sale will be borne by the buying company and not the current customers**. In the context of banking and thrift institution acquisitions, it is noted that such acquisitions are seldom consummated solely for the purpose of acquiring a portfolio of interest-bearing assets. Instead, **premiums are often paid to enter new markets (like Qenta was doing in PR),** acquire established branches with existing customer relationships, and other factors that contribute to the overall firm value. Specifically, FAS 72 (Statement of Financial Accounting Standards No. 72, refers to the guidelines set by the Financial Accounting Standards Board -FASB- concerning accounting for certain acquisitions of banking or thrift institutions. Under FAS 72, companies are required to recognize specific assets and liabilities when they acquire another entity, particularly banking or financial institutions), which states that such acquisitions are typically driven by the desire to enter new markets, acquire established branches with existing customer relationships, and acquire an existing deposit base, among other factors. See also United States Court of Appeals for the Federal Circuit Anchor Sav. Bank, FSB v. United States, 81 Fed. Cl where the Government allowed the bank to count supervisory goodwill it received in the mergers as an asset and to amortize the goodwill over a period of many years. However, that approach changed after Congress enacted the FIRREA in 1989, and because the bank was no longer allowed to count supervisory goodwill as part of its capital it had to sell assets to raise capital, resulting in a loss of profit. Also, as an Act 22 grantee, Plaintiff would have paid zero capital gains tax on a stock sale.

(a) These cases and principles support the assertion that asset sales typically bring less proceeds to the table than stock sales, and financial regulators like OCIF should be aware of these dynamics when making decisions that impact the financial outcomes of such transactions.

f) As of today, it has been over 28 months now and none of the customer's funds has been returned. The first negative news stories from the media about the bank broke in Oct. of 2020. In contraposition, between Oct. of 2020 and June 30th, 2022, about $200 million of customers deposits, representing over 70% of the bank's total deposits, were successfully

withdrawn by customers without any issue. To liquidate a bank that made no loans, has no debt, and holds 100% of its assets in cash should not have taken that long.

i)  OCIF reported the bank had "Precious metals held for customers are categorized as non-earning assets that generate consistent revenues at initial purchase, maintenance, and trade; these represent 13.04% of total assets", implying these were not liquid assets. In actuality, the bank neither owned any gold nor other precious metals. It had a hedge account at Saxo Bank (headquartered in Copenhagen, Denmark; Saxo Bank is a Danish investment bank that specializes in online trading and investment, offering access to global financial markets for retail and institutional clients) to facilitate customer buying and selling of gold & other precious metals. The account would take the other side of customer orders and automatically hedge. When the position got too large, it would be flattened, and the funds would free up. The bank could have manually flattened the account anytime it wanted, which was ultimately done after the bank went into receivership.

g)  On Nov/10/2021, a meeting was held to gain OCIF's approval of the bank's proposed stock sale. Present in that meeting were: Plaintiff and his lawyer, Ms. Myrna Lozada and her assistant, two representatives from Qenta/Emergent Technology (Mr. Brent De Jong CEO Emergent Technologies & Mr. Carlos Garduno Emergent Technologies in-house counsel) Mr. Zequeira, and some other OCIF's employees. In that meeting, Plaintiff offered to personally inject seven million dollars in capital to the bank, an amount that was millions more than required to cover any possible capital deficiency, but Ms. Zequeira personally told Plaintiff that no additional capital was necessary for the bank to operate while the proposed stock sale was under review, a process that Ms. Zequeira represented was a mere formality, as she expressed strong support for the sale, welcomed Mr. De Jong and Garduno to Puerto Rico, and said that she hoped the Plaintiff would remain in Puerto Rico after the sale was completed.

h)  On June 30th, 2022, the already mentioned worldwide, extensively disseminated, press conference by OCIF, IRS & J5 (with Mr. Will Day of the Australian Tax Office, and Mr Simon York of HMRC in the U.K representing J5 as well as Mr Jim Lee from the IRS) was held, where Mr. Lee confirmed that the Plaintiff's bank was indeed the target of an IRS & J5 investigation since Jan. 2020 and implied, without actual proof, that the bank engaged in illegal tax evasion and criminal money laundering activities, causing significant reputational harm to the Plaintiff and the bank. No charges have ever been filed against the Plaintiff, the bank or anyone former bank employees, officers, directors, or shareholders. Indeed, the grand jury investigation was supposed to be kept confidential. The government asked the Plaintiff to keep it confidential. Jim Lee had an obligation to keep it confidential as well but violated standard government procedures and Plaintiff's constitutional rights by making the investigation public instead. It is significant that the

9

media, including Goldstein, Grieve and Mckenzie, were informed about this press conference and the action to be announced hours before the Bank, the bank's lawyer, or Plaintiff. This is more proof that the entire thing was a publicity stunt, not a legitimate regulatory action.

i)   All the members of the J5 (but IRS) participated virtually in the press conference by representation of some official from their respective entities, which was held in Puerto Rico, where the IRS and OCIF were physically represented. Plaintiff contends this virtual presence is more than enough basis to find personal jurisdiction and membership in the conspiration based on:

   (1) If a person was present at a virtual conference but did not state any disclaimer as to the false statements, liability may still attach if that presence and lack of disclaimer are seen as tacit approval or facilitation of the defamatory statements. In "Harrison v. Aztec Well Servicing Co.," the United States District Court for the Northern District of Texas, Abilene Division noted that specific personal jurisdiction over a defamation claim could be exercised where a nonresident defendant made false statements to a forum resident. *Harrison v. Aztec Well Servicing Co., 2020 U.S. Dist. LEXIS 259084*. Additionally, in "Sisk v. Elevate Indep. Servs.," the Superior Court of California, County of San Francisco held that passive facilitative acts, such as convening a meeting where defamatory statements are made, do not constitute substantial assistance or encouragement for aiding and abetting liability unless there is active involvement in the content of the defamatory statements. *Sisk v. Elevate Indep. Servs., 2016 Cal. Super. LEXIS 4808.*

   (2) However, if that person were present but did not state any disclaimer as to the false statements, liability would depend on whether that presence and lack of disclaimer could be seen as negligent or as implicitly endorsing the defamatory statements. According to the Restatement (Second) of Torts, liability for defamation requires a false and defamatory statement, an unprivileged publication to a third party, fault amounting to at least negligence, and certain types of harm. *Jimenez-Nieves v. United States, 682 F.2d 1*. United States Court of Appeals for the First Circuit. If that presence without a disclaimer is interpreted as negligence, that person could be held liable.

   (3) If the person actively participates in making defamatory statements, that person would likely be liable. In "Pelt v. Amell," the District Court of Texas, 157th Judicial District, Harris County found that defendants who participated in making defamatory statements were personally liable for the damages caused. *Pelt v. Amell, 2023 Tex. Dist. LEXIS 4331*. Similarly, in "Zedan v. Bailey," the United States District Court for the Middle District of Georgia, Valdosta Division held that publishing false statements with reckless disregard for their truth constitutes

actual malice, making the defendant liable for defamation. *Zedan v. Bailey, 522 F. Supp. 3d 1363*. Furthermore, "Flores-Demarchi v. Smith the Court of Appeals of Texas, Thirteenth District, Corpus Christi - Edinburg outlines that defamation requires the publication of a false statement of fact to a third party, which is defamatory concerning the plaintiff and made with the requisite degree of fault, resulting in damages. *Flores-Demarchi v. Smith, 2022 Tex. App. LEXIS 4489.*

(4) It is quite clear that if the person actively participated in making defamatory statements, the person would likely be liable. Defamation law requires that the defendant was at fault for the publication of a false statement about the plaintiff which was capable of damaging their reputation and causing economic loss or being actionable without proof of economic loss *Piccone v. Bartels, 2012 U.S. Dist. LEXIS 141817*. United States District Court for the District of Massachusetts. Sep 29, 2012. Active participation in making defamatory statements would clearly meet the fault requirement, making the person liable for any resulting damages. In both scenarios, the extent of the person's involvement and the nature of the statements would be critical in determining liability. Courts are prompt to consider whether the statements were false, defamatory, and whether the person acted negligently or with actual malice. *Yohe v. Nugent, 321 F.3d 35, Sandler v. Calcagni, 565 F. Supp. 2d 184*. United States Court of Appeals for the First Circuit. Feb 26, 2003, Additionally, the context and manner in which the statements were made, including whether they were presented as opinions or facts, would also be relevant. The control question is whether the challenged language would reasonably be understood to declare or imply provable assertions of fact, which requires examining the totality of the circumstances, including the general tenor and context of the conversation and any cautionary terms used by the person publishing the statement. *Kaveh Afrasiabi v. UPI, 561 F. Supp. 3d 1.* United States District Court for the District of Massachusetts, Sep 22, 2021.

(a) Therefore, active participation in defamatory statements would clearly establish liability, while mere presence without disclaiming false statements could also potentially lead to liability depending on the context and perceived endorsement of the statements. In this case, the presence (virtual or physical) of all the 5 members of J5 was a statement of unity and commitment to the cause, thus making each and every one of them liable, regardless of if they actually participate in the defamation by saying something or not. Their mere presence (although virtual in some cases) was an act of solidarity with the statements made; presumably guided due to their alleged conspiration to cause damage to the bank and Mr. Schiff.

(b) In addition, in this case, both Mr. Simon York and Mr. Will Day made statements at the press conference implying the bank was guilty of facilitating tax evasion and money laundering and repeated those statements in public on multiple occasions following the press conference. It is also likely that they, along with the other J5 Chiefs, were involved in the conspiracy to get Ms. Zequeira to block the sale and liquidate the bank, long before their virtually participation at the press conference linking OCIF's action to their investigation.

(c) OCIF was physically present, represented by Ms. Zequeira whose weak statement given only in response to a reporter's direct question about whether the bank helped its customers launder money or evade taxes: "That is a conclusion that has not been made" and that the action against the bank "was not based on claims of money laundering or any financial crimes" was not strong enough to reject the whole set of statements made by Mr. Lee and certainly is not enough to set OCIF apart from the rest of their alleged co-conspirators. More significantly, that exculpable admission was not part of Ms. Zequeira's prepared remarks, and but for the reporter's unscripted question, never would have been made. Plus, that statement was completely absent from the media stories that were reported about the press conference, most conspicuously those written by the N.Y. Times and The Age. Further, Ms. Zequeira, while clearly aware of the many false representations made by the media, made no effort to correct them.

(i) Less than three months after the Press Conference, on September 22, 2022, the Australian Trial Court issued a 47-page judgment, in the case of Peter Schiff vs. Nine Network Australia, The Age Company, Nicholas McKenzie, Charlotte Grieve, and Joel Tozar, finding all five liable for seven false and defamatory statements, published and publicly stated about Mr. Schiff regarding the same or similar false and misleading statements made by Mr. Lee and two other J5 Chiefs during at the Press conference, while Ms. Zequeira stood by in approval.

(5) The United States can assert jurisdiction over a non-resident who participates virtually in a conference in the U.S. that causes damages, provided certain conditions are met. Specifically, the non-resident must have purposefully directed activities at the forum state, and the cause of action must arise from or be connected with those activities. Additionally, the exercise of jurisdiction must not offend traditional notions of fair play and substantial justice.

(a) In "Mastercraft Floor Coverinsubmit v. Charlotte Flooring, Inc.," the Supreme Court of Oklahoma held that a non-resident who deliberately engages in significant activities in a forum state or creates continuing obligations with

residents of the forum state submits to the jurisdiction of that state, even if they did not physically enter the forum state. *Mastercraft Floor Covering, Inc. v. Charlotte Flooring, Inc., 2013 OK 87*. Similarly, in "Velto v. Draeger Med., Inc.," the United States District Court for the Western District of Washington found specific jurisdiction over a non-resident who committed a wrongful act during conference calls, knowing the plaintiff was a resident of the forum state, and the cause of action arose from those calls. *Velto v. Draeger Med., Inc., 2009 U.S. Dist. LEXIS 57088.*

(b)  Furthermore, in "Fundient, LLC v. Johnson Controls, Inc.," the United States District Court for the Western District of Texas noted that specific jurisdiction could be established based on the "effects" of the tortious conduct being felt in the forum state, regardless of the physical location of the parties during the virtual meeting. Fundient, LLC v. Johnson Controls, Inc., 2023 U.S. Dist. LEXIS 54812. This principle aligns with the "effects test" used in other cases, which requires that the defendant's conduct be purposefully directed at the forum state, causing harm that is felt there. *In re Royal Ahold N.V. Sec. & ERISA Litig., 351 F. Supp. 2d 334, Walden v. Fiore, 571 U.S. 277*. United States District Court for the District of Maryland.

    1.  Therefore, all those persuasive cases tend to establish that if a non-resident's virtual participation in a U.S. conference causes damages and meets the criteria of purposeful direction and connection to the forum state, U.S. courts could assert jurisdiction over the non-resident.

(c) As for the 1st Circuit, it has been established that the United States can assert jurisdiction over a non-USA non-resident who participates virtually in a conference in the US that causes damages, under certain conditions. Specifically, the "effects" theory of personal jurisdiction, as recognized in Calder v. Jones, allows a court to assert jurisdiction if a defendant commits an act outside the forum state that is intended to and does cause injury within the forum state. *Calder v. Jones, 465 U.S. 783 (1984).* This principle has been upheld in the 1st Circuit, where the United States District Court for the District of New Hampshire noted that a defendant need not be physically present in the forum state to cause injury there. *New Eng. College v. Drew Univ., 2009 DNH 16*. United States District Court for the District of New Hampshire. For specific jurisdiction to be established, the claim must relate to or arise out of the defendant's contacts with the forum, the contacts must constitute purposeful availment of the benefits and protections of the forum's laws, and the exercise of jurisdiction must be reasonable Virtual contact, such as participating in a conference, can meet the purposeful availment requirement

if the defendant's actions are purposefully directed at the forum state. *Groma, LLC v. BuildRE, LLC, 668 F. Supp. 3d 40*. United States District Court for the District of Massachusetts. Additionally, the constitutional limits on jurisdiction over non-residents, including those outside the US, require that the defendant have minimum contacts with the forum state such that maintaining the suit does not offend traditional notions of fair play and substantial justice. *Plixer Int'l, Inc. v. Scrutinizer GmbH, 293 F. Supp. 3d 232*. United States District Court for the District of Maine, *Noonan v. Winston Co., 135 F.3d 85*. United States Court of Appeals for the First Circuit. This includes cases where the defendant's virtual activities have a direct effect in the forum state.

1. Therefore, if the non-resident's virtual participation in the conference was intended to and did cause harm within an US jurisdiction, and if the other requirements for specific jurisdiction are met (such as minimum contacts with the forum), the US courts could assert jurisdiction over the non-resident defendant.

(d) For specific jurisdiction to be established, the claim must relate to or arise out of the defendant's contacts with the forum, the contacts must constitute purposeful availment of the benefits and protections of the forum's laws, and the exercise of jurisdiction must be reasonable Virtual contact, such as participating in a conference, can meet the purposeful availment requirement if the defendant's actions are purposefully directed at the forum state. *Groma, LLC v. BuildRE, LLC, 668 F. Supp. 3d 40*.

(e) The minimum contacts analysis focuses on the relationship among the defendant, the forum, and the litigation. The non-resident must have purposefully availed themselves of the privilege of conducting activities within the forum state, invoking the benefits and protections of its laws. This ensures that the non-resident will not be subject to jurisdiction based on random, fortuitous, or attenuated contacts, or the unilateral activity of another party. *Esse v. BP Am. Prod. Co., 2006 Tex. App. LEXIS 3813*, Court of Appeals of Texas, First District, *Houston & Royal Mortg. Corp. v. Montague, 41 S.W.3d 721, Kaye v. Karp, 237 So. 3d 614,* Court of Appeals of Texas, Second District, Fort Worth.

(f)  Even a single act can support jurisdiction if it creates a substantial connection with the forum state. For instance, **as happened in this case**, if the non-resident's virtual participation in the conference was intended to or foreseeably would cause harm within the forum state, this could constitute sufficient minimum contacts. The key is whether the non-resident's conduct shows that they reasonably anticipated being hailed into court in the forum state due to the effects of their actions.

1. In summary, the non-resident's virtual participation in the conference must be purposefully directed at the forum state, and the resulting litigation must arise out of or relate to those activities. The non-resident must have fair warning that their conduct could subject them to jurisdiction in the forum state. *Nikolai v. Strate, 922 S.W.2d 229, Laughlin v. Perot, 1997 U.S. Dist. LEXIS 4987*. Court of Appeals of Texas, Second District, Fort Worth.

2. All members of J5, an organization committed to combatting transnational tax crime, knew, or should have known, their conference could bring out a legal process (at least an administrative or civil action or even a local criminal case). Thus, they had "fair warning" by its own knowledge and professional experience their virtual presence could be considered as conceding minimum contacts and personal jurisdiction in this forum.

i) Early on that same date, June 30, 2022, OCIF issued a cease-and-desist order as a "a *summary emergency action* that seeks *to prevent an imminent danger* for the security of the industry of international financial institutions" (phrase taken from the first paragraph of said cease and desist order), under the pretense that the bank was "critically insolvent" and lacked sufficed capital to operate. This despite the fact that the bank had no debt, made no loans, had no delinquent bills, and held millions in cash above what was owed to depositors. Also, in the cease-and-desist order, Ms. Zequeira falsely claimed she denied the sale to Qenta because she recently discovered that Mr. Schiff would own 4% of Qenta stock after the sale. Despite being fully informed verbally and in writing, and having discussed the terms of the stock sale with Plaintiff at length during the meeting seven months earlier, even if she was being honest and forgot everything she was told and read about the stock sale, she never gave Plaintiff the opportunity to restructure the sale to Qenta for consideration other than stock and that reason was not among the three factors OCIF raised before for a denial that was only based on a simple misunderstanding and some missing information, all of which were fairly easy to correct and were, in fact, corrected in the reconsideration motion. Notwithstanding that fact, the reason stated in the press conference was "lack of capitalization", not the fact that sale would result in Plaintiff owning stock in Qenta. The contradictions and arbitrary behavior from OCIF and Ms. Zequeira are clear.

(1) Therefore, at all times between Plaintiff's Nov. 10, 2021, offer to inject $7-millions in capital, and the issuance of the June 30, 2022, cease and desist order, Ms. Zequeira knew that Plaintiff stood ready to inject $7 million in capital on request, yet neither Ms. Zequeira nor anyone at OCIF informed Schiff or anyone at Euro Pacific Bank, that additional capital was needed or required to approve the stock

sale. But Ms. Zequeira would not allow the capital injection, since such an action would have destroyed OCIF's only public excuse to close the bank, which was that it was "critically insolvent". In fact, despite Ms. Zequeira's Nov. 10, 2021, verbal assurance to Plaintiff that the bank did not need any additional capital, Plaintiff personally added $1.9 million to cover the bank's operating costs, Ms. Zequeira was also well aware that Mr. Schiff had been personally covering the bank's operating losses prior to their Nov. 10 2021 meeting, and the Mr. Schiff had signed a letter to the bank's auditor, Kevane Grant Thornton LLP, committing to his ongoing financial support of the bank to cover any operating losses, thus knew no customer deposits were at risk, and that Mr. Schiff was fully committed and had the financial resources, to always protect customers.

(2) The bank timely filed with OCIF the license renewal in Jan 2022; however, it was not until the June 30th, 2022, Cease and Desist that the bank was informed that its license had not been renewed and was fined $5,000 per day for "having operated a bank without license" for all those months. However, it is OCIF's standard practice to send the licenses several months after the filing is done. Thus, in practice, banks must continue operating under the assumption of having a license until getting the license in the mail or getting a notification to the contrary. Not only that, but also, OCIF's Jun 2022 action was against its own acts, as it provided a false sense of security that the stock sale was a done deal during all those months and that the bank's license had been renewed. The proposed stock sale required Qenta to contribute $8 million in capital once OCIF issued final approval of the change of control which included a valid banking license and OCIF was well aware of that fact. OCIF original rejection of the sale to Qenta on May 16th, 2022, made no mention of the bank's license having expired four months earlier. Also, if the bank's license had really expired in Jan, why would OCIF encourage Qenta and the Plaintiff to submit a motion to reconsider the sale of an expired banking license? It is obvious that Ms. Zequeira only decided not to renew the license when she drafted the C&D in June, so that she could impose a $700,000 fine that not only enriched OCIF but made the bank look as if it was not in compliance. The fine was widely reported in the media. Finally, if Ms. Zequeira really believed the bank was "critically insolvent", and indeed acted to protect depositors, why would she add to the bank's insolvency by imposing a $700,000 fine that increased the risks to depositors?

(3) In addition, emails between an unknown IRS agent and Mr. Jim Lee showed that the June 30th, 2022, press conference was actually scheduled with OCIF cooperation about three months earlier. The bank's capital was just as low three months prior as it was on June 30th. If the bank was truly so "critically insolvent"

that it required a cease-and-desist order "*summary emergency action that seeks to prevent an imminent danger*", why did Ms. Zequeira and OCIF wait three months to issue it? Or about one month and a half after the denial in mid-May? On information and belief, it appears the June announcement was delayed to coincide with and commemorate the four-year anniversary of the formation of the J5.

(a) It looks like that the main reason OCIF waited three months to serve the Cease & Desist against the bank was to allow the press conference to coincide with the four-year anniversary of the formation of the J5, allowing the J5 to commemorate the occasion with its first and only enforcement "success."

(b) That would also explain why Ms. Zequeira & OCIF knew for three months that they planned to shut down the bank for insufficient capital, yet not once during those months did anyone from OCIF try to contact the bank to give Mr. Schiff the opportunity to cure the capital deficiency to avoid the shutdown. Capital deficiency was not even one of the three reasons OCIF gave for the denial of the stock sale to Qenta. It is clear Ms. Zequeira/OCIF did not want Mr. Schiff to add capital to the bank, as they needed the lack of capital as an excuse to shut it down, as only a shutdown would serve the interests of her co-conspirators. In fact, after the cease-and-desist was issued, Mr. Schiff again offered to inject additional capital, yet that offer was again turned down.

(4) As further *persuasive arguments* that the court should find jurisdictions for all the defendants in this case, for the Commonwealth of Puerto Rico' Penal Code Article 244. — Conspiracy. (33 L.P.R.A. § 5334) is clear that the Commonwealth of PR would have personal jurisdiction over all the defendants if the conspiracy is true, and so this Court:

(a) A **conspiracy is an agreement or arrangement between two or more persons to commit a crime and have formulated precise plans regarding the participation of each person, the time and place of the events**.

(b) When the agreement has as its purpose the commission of a less serious crime, it will be a less serious crime.

(c) If the agreement is to commit a serious crime, it will be punished with imprisonment for a fixed term of three (3) years.

(d) No agreement, except to commit a serious crime against any person, or to commit the crime of setting fire to or climbing a building, constitutes conspiracy unless some act is concurred to carry it out by one or more of the conspirators.

      **(e) A penalty with aggravating circumstances will be imposed when one of the conspirators was a public order official and took advantage of his position to commit the crime.**

(5)  Furthermore, Article 3. — Scope of application of the criminal law. (33 L.P.R.A. § 5003)

      (a) **The criminal law of Puerto Rico applies to crimes committed or attempted within the territorial extension of the Commonwealth of Puerto Rico**.

      (b) The **territorial extension is understood to be the land, sea, and air space subject** to the jurisdiction of the Commonwealth of Puerto Rico.

      **(c) Notwithstanding the foregoing, the criminal law of Puerto Rico applies outside the territorial extension of the Commonwealth of Puerto Rico in any of the following cases:**

          (i)  (a) Crimes whose result has occurred outside of Puerto Rico when part of the typical action or omission is carried out within its territorial extension.

          (ii)  (b) **Crimes whose result has occurred in Puerto Rico when part of the typical action or omission has occurred outside of its territorial extension**.

          **(iii)** (c) **Crimes committed or attempted by a public official** or employee or a person serving in his or her service **when the conduct constitutes a violation of the functions or duties inherent to his or her position or assignment.**

          (iv) (d) Crimes of genocide or crimes against humanity, as defined in this Code.

          (v) (e) Crimes that may be prosecuted in Puerto Rico, in accordance with treaties or agreements ratified by the United States of America.

(6)  Also, Article 87. — Statute of Limitations. (33 L.P.R.A. § 5132)

      (a) The **statute of limitations for criminal prosecution** shall be:

          (i)  (a) Within **five (5) years, for serious crimes**, and for serious crimes classified in the special law.

          (ii)  (b) Within one year, for less serious crimes, except those arising from violations of the tax laws and any less serious crime committed by public officials or employees in the performance of their duties, which shall be subject to a statute of limitations of five (5) years.

          (iii) (c) The crimes of concealment and conspiracy shall be subject to a statute of limitations of ten (10) years, when committed in relation to the crime of murder.

          (iv) (d) Within ten (10) years, for the crimes of homicide.

          (v) (e) Within twenty (20) years, for the crimes of sexual assault, incest, and lewd acts

(b) The provisions of paragraphs (a) and (b) of this Article do not apply to special laws, whose crimes have a statute of limitations period greater than that proposed here.

j) After the June 30th 2022 surprise, Mr. Schiff made multiple FOIA requests regarding IRS Chief Jim Lee's communications and the press conference to close the bank that finally resulted in or about April 2024 the IRS sending the Plaintiff 335 pages- most where almost entirely redacted; the IRS delayed several times the production of the requested documentation. It was at that moment -when the 335 pages were finally received and read- that Plaintiff realized the IRS had recruited OCIF and its Commissioner into rejecting the sale of the bank and closing it. It seems that, since the J5 & the IRS could not find any evidence of illegal acts or wrongdoing from the bank or Plaintiff, their frustration become blinding, and they opted to recruit OCIF to announce the closure of the bank instead; and, that was the reason for the June 30th, 2022 press conference: to set-up a public show, a public execution if you will, to make an example of the bank, and to send a warning to customers of other offshore banks, who might use those accounts to evade taxes, of what would happen if you came into their radar, even without any evidence of any illegal activity from the bank, or Plaintiff. Those pages also tended to indicate that, to save face, the IRS & J5 pressured OCIF to close the bank, given that the media had exposed the IRS & J5 investigation, which came up empty. By getting OCIF to shut the bank down, the IRS & J5 could pretend their failed investigation was a success. Plaintiff came to finally realize all of this after reading previously unknown IRS emails on April 22,2024. Even though prior to that date, the Plaintiff was always a little suspicious of the IRS & J5 actions, he had no actual evidence to refute the defendants' false assertions to close the bank until that date. This was mainly due to his inner belief that the IRS & J5 could not be acting illegally and discriminatory. But the April 2024 discovery of the alleged conspiracy provided unambiguous evidence to allow Plaintiff to file this action in good faith. It is important also to note that the damage continues to this day, as the bank is still in receivership and hemorrhaging proceeds that could have been used to pay its customers, with any excess capital remaining to distribute to Plaintiff. As it looks right now, the bank's customers may lose money, and Plaintiff will recover none of the over $10 million in capital he paid into the bank. Plaintiff contends the conspiracy is ongoing as well, as the IRS and J5 are allegedly still actively engaged in a coverup to prevent Plaintiff from exposing the truth about the bank and the J5 investigation that completely exonerated it of the crime's defendants continue to pretend were committed.

(1) The Plaintiff believes that the IRS leveraged removing Puerto Rico from the list of high-risk money laundering jurisdictions as a quid pro quo to entice Ms. Zequeira into their conspiracy to shut down the bank and hold the press conference. Inclusion on that list was a major problem for Puerto Rico's offshore banking

industry, which the OCIF Commissioner regulated. The IRS first included Puerto Rico as a high-risk jurisdiction for money laundering and terrorism financing in 2021, not too long after the negative news stories broke about the J5 investigation of Euro Pacific Bank (it is believed this may not have been a coincidence). This designation arose due to concerns over compliance deficiencies in Puerto Rico's international financial entities (IFEs) and "cooperativas" (credit unions) that could pose vulnerabilities in the U.S. financial system. As part of the U.S. Treasury's National Money Laundering Risk Assessment, this inclusion aimed to address gaps in transparency, beneficial ownership, and regulatory oversight of these institutions on the island. See "2022 National Money Laundering Risk Assessment: Impact on Puerto Rico", dated 2022 a report authored by Ms. Zequeira herself. To be removed from that list will be seen as a significant achievement by Ms. Zequeira, especially when it was under her purview that the island was included. The removal, in fact, occurred in Feb. 2024, Plaintiff thinks this is likely as a payoff for her continued role in the conspiracy.

(2) It is also believed by the Plaintiff that another compelling reason to go along with the conspiracy for Ms. Zequeira is the fact his husband works in a competing international bank in PR (which are regulated by OCIF), which is a clear conflict of interest, since at least Aug 2023, when said bank was authorized to operate, but due to the long time it takes to approve a license, Ms. Zequeira likely knew about this conflict of interest well before that date. Up to this day, Ms. Zequeira has not relinquished her post as Commissioner.

   (a) Another lawsuit against OCIF & Ms. Zequeira in this District Court was initiated by Nodus International Bank for discrimination in its national origin variant, evident conflict of interest and due process violation in its procedural version (which support Plaintiff arguments of discrimination and arbitrary actions from OCIF and Ms. Zequeira).

(3) Although local statutes of limitation are used for federal causes of action for which Congress has not provided an express limitation period, tolling policy for such a case remains a federal question. Concept of tolling applies when defendant fraudulently conceals facts giving rise to Plaintiff's claim as in this case, where both Ms. Zequeira/OCIF and the IRS did; in such case, statutes are tolled until Plaintiff, employing due diligence, could have discovered facts that were fraudulently concealed. *Richards v. Mileski, 662 F.2d 65 (1981), 213 U.S.App.D.C. 22;0, 32 Fed.R.Serv.2d 437*. Indeed, had the IRS honestly and timely complied with Plaintiff's initial FOIA request, he would have discovered the smoking gun emails well within a year of the June 2022 press conference. In fact, Plaintiff is

concurrently litigating another case in federal court trying to force the IRS to fully comply with his FOIA request.

(4) As stated above, Plaintiff was first made aware of the alleged conspiracy when he learned in April 2024 that the rejection of the bank's stock sale and its incoming liquidation, were based on wrongful assertions that seemed to have been secretly planned by the defendants over three months before the Jun 2022 official announcement. Also, it was in April 2024, Plaintiff found out the bank's motion for reconsideration of that initial rejection was not considered in good faith, even though it was suggested by Ms. Zequeira in the first place. In fact, when Ms. Zequeira invited the Plaintiff to submit a motion for reconsideration, in May 2022, it was two months after she had already planned to issue the cease-and-desist order and hold the press conference to announce the closure of the bank. These actions caused the complete destruction of Plaintiff's bank, as well as Plaintiff's banking reputation, resulting in other lost business opportunities. In fact, Plaintiff contributed over $500,000 in capital between the day Ms. Zequeira and the IRS decided to shut down the bank and the day she informed Mr. Schiff of that decision. Had the Plaintiff known about this alleged secret deal he would not have contributed the additional capital, which only added to his financial damages.

(5) The US Supreme Court has held that statutes of limitation in federal civil rights cases may be tolled when defendants fraudulently conceal critical facts, as seen, for instance, in *Richards v. Mileski, 662 F.2d 65 (D.C. Cir. 1981)*. Under this view, the Plaintiff's claim is timely due to the concealment by the IRS/J5 and OCIF, which prevented the Plaintiff from discovering the full extent of the alleged conspiracy prior to April 2024.

   (a) Richards v. Mileski, 662 F. 2d 65, was decided by the United States Court of Appeals for the District of Columbia Circuit; thus, is not a binding precedent that must be followed by the 1st Circuit; which is not required to follow the decisions of other circuit courts, although such decisions may be considered persuasive authority. Ky. SCR Rule 1.040.

   *(b)* However, in the 1st Circuit, cases similar to *Richards v. Mileski, 662 F. 2d 65*, involve issues of fraudulent concealment and the tolling of the statute of limitations. For instance, in Truck Drivers & Helpers Union, Local No. 170 v. NLRB, the United States Court of Appeals for the First Circuit discussed the burden of proving due diligence in cases where fraudulent concealment is alleged. The court noted that when the concealment is self-concealing, the defendant bears the burden of showing that the plaintiff could have discovered the cause of action with due diligence. *Truck Drivers & Helpers Union, Local No. 170 v. NLRB, 993 F.2d 990.*

(c)   Another relevant case is Demars v. General Dynamics Corp., where the United States Court of Appeals for the First Circuit addressed the tolling of the statute of limitations due to fraudulent concealment. The court emphasized that the plaintiff must show that the defendant engaged in deliberate concealment of material facts and that the plaintiff failed to discover these facts despite exercising due diligence. *Demars v. General Dynamics Corp., 779 F.2d 95*.

(d)   Additionally, in Greene v. Union Mut. Life Ins. Co., the United States Court of Appeals for the First Circuit referenced Richards v. Mileski in the context of discussing the inherent problems of using a motion to dismiss to raise a statute of limitations defense, highlighting the complexities involved in such procedural issues. *Greene v. Union Mut. Life Ins. Co., 764 F.2d 19.*

(6) Under state law, the controlling case would be *Colon Prieto v. Geigel, 115 D.P.R. 232; 1984 PR Sup. LEXIS 82, 115 D.P.R. 232, 1984 PR Sup. LEXIS 82* where a dentist caused injury to the patient's tongue and when the patient asked about the pain, the dentist lied and occulted the actual reason for about 4 months when, as the pain did not stop, the patient went to a specialist, who actually found out the real cause of the injury about 8 months afterwards and informed the patient at that time. The patient sued the dentist one year after the specialist told him the actual cause. The Supreme Court of PR held the case was tolled until the patient actually found out what was the real cause for his injuries and who was the wrongdoer. The fact the patient felt pain did not mean the patient actually knew what the real cause of pain was or who actually caused it. Citing from that case:

(a)   "Colón Prieto became aware of the injury to his tongue on November 10, 1971. When, immediately after the operation, he asked his physician, Dr. Ark, about it, the doctor told him that the wound had been caused by the fact that he had bitten his tongue. He went to see Dr. Ark several times. The fact that he continued suffering --as the trial court stresses--does not necessarily mean that he knew about the origin of the injury. Dr. Ark himself told him that he could soon feel better. The last time he went to see the doctor the latter told him that, if the condition continued, he should return in four months. It is reasonable to think that Colón Prieto trusted his physician because all doctors are in the obligation to inform patients of the status of their condition and clinical prognosis, except in cases where such report would hamper treatment or aggravate the patient's course of action.

(b)   In such circumstances, it cannot be said that he knew about the injury since the operation. As a patient, he trusted the physician. It was not until November 10, 1972, when he consulted other physicians--particularly Dr. Ramírez de Arellano--that he found out that the injury had not been caused by a bite but

by the fact that the right lingual nerve had been cut. It was then that he became aware that the damage was probably caused by Dr. Ark's lack of expertise. Under the "subjective" test applicable to actions against physicians, the statute of limitations started to run on that date, and when he filed his complaint his cause of action had not expired."

*(i)* In Correa v. Perez, Court of Appeals of Puerto Rico, Ponce Judicial Region discussed the cognitive theory of damage, which states that the prescriptive period for tort actions begins when the injured party knows of the damage and the responsible party, not at the moment of the negligent act. *Correa v. Perez, 2011 PR App. LEXIS 2153*. In Carmen González v. Hosp. San Francisco, the Circuit Court of Appeals of Puerto Rico, Regional Circuit I of San Juan, Panel II reiterated that the prescriptive period starts when the injured party knows of the damage and the identity of the responsible party, aligning with the liberal civil law doctrine. *Carmen González v. Hosp. San Francisco, 2001 PR App. LEXIS 418*. In José Llanos Bultrón v. Universidad De P.R., the Court of Appeals of Puerto Rico, San Juan, and Humacao Judicial Region emphasized that the prescriptive period begins when the claimant knows both the damage and the identity of the responsible party, highlighting the complexity of determining when the claimant acquired the necessary knowledge. *José Llanos Bultrón v. Universidad De P.R., 2008 PR App. LEXIS 2967*. In Calderon v. Toro, the Circuit Court of Appeals of Puerto Rico, Regional Circuit of Caguas, Humacao and Guayama confirmed that the prescriptive period starts when the injured party knows of the damage and the responsible party, consistent with the liberal civil law doctrine. *Calderon v. Toro, 1999 PR App. LEXIS 296*. In Ojeda Ojeda v. El Vocero, Inc., the Supreme Court of Puerto Rico reiterated that the prescriptive period for tort actions begins when the injured party knows of the damage and the responsible party. *Ojeda Ojeda v. El Vocero, Inc., 137 D.P.R. 315*. In De Seguros De v. Blanco, the Court of Appeals of Puerto Rico, San Juan Judicial Region reiterated that the prescriptive period for tort actions begins when the injured party knows of the damage and the responsible party, and discussed the interruption of the prescriptive period. *De Seguros De v. Blanco, 2020 PR App. LEXIS 2465*.

(c) To hold otherwise, would have created a twisted incentive for the wrongdoer to deceive the injured until the action was time-barred; thus, rewarding the wrongdoer when he is in possession of the information that could brought out the actual action is an inconceivable act against justice and the law.

(d) In an analogous way, the IRS's multiple delays for the requests for information under FOIA tolled the Plaintiff's action since the Plaintiff was diligent asking for information, trusting the IRS, and the IRS made it impossible to know about the alleged conspiracy until April 2024. In fact, this alleged coverup is still ongoing and is the reason Plaintiff is now involved in separate litigation against the IRS to force it to fully comply with FOIA and release more documents that will provide further details about the conspiracy.

k)   Facing such situation starting in June 2022, the Plaintiff was under severe duress and emotional, economic, personal and psychological challenges, including a COVID19 infection, as well (among other things, the plaintiff was in the middle of a defamation lawsuit against the press- Nine, network that owns 60 Minutes in Australia- over the same false allegations, which he ultimately won over a year later): As Ms. Zequeira originally enthusiastically supported the stock sale of the bank to Qenta in Nov 2021, Plaintiff thinks it is apparent that her sudden change of direction was driven by Mr. Lee and other IRS agents acting on behalf of the IRS/J5, who were clearly the primary drivers of the alleged conspiracy, as they sought to save face from a high-profile investigation, that was illegally leaked to the media, yet yielded no indictments. The IRS & J5 engaged in an illegal act of wrongful persecution with the sole objective of the destruction of Plaintiff's business and personal reputation. OCIF and the Trustee failed to exert independent judgment and instead opted, under the direction of Ms. Zequeira, to play along, thus committing illegal acts against Plaintiff, instead of looking for the best interest of the bank's customers and general creditors as well as Puerto Rico banking industry as OCIF & the Trustee main mission should be. This all became the alleged conspiracy to illegally shut down the bank and, in the way, damage Plaintiff personal & professional reputation and well as his businesses.

l)   Under such duress and in an environment that clearly voided Plaintiff's thoughts and actions, Plaintiff signed a deal with OCIF that provided for a 90-day liquidation process, with any remaining cash distributed to Plaintiff.; thus, the administrative proceedings were never initiated. The promise of a quick liquidation process is one of the main reasons Plaintiff signed the agreement. It was, Plaintiff thought at the moment, a way to finish the nightmare that, unfortunately, continues today. Also, the Plaintiff's attorneys told him that OCIF was steadfast in its commitment to fully liquidate the bank, and that if the Plaintiff went to the administrative proceeding's hearing, Plaintiff would lose for sure. It was advised that OCIF would not believe the Plaintiff over the Commissioner, as her verbal representations that additional capital was not needed were not in writing. Plus, the lawyers advised the Plaintiff that OCIF would always give the Commissioner the benefit of the doubt that she was operating in good faith. It was not until April of 2024 that Plaintiff finally got the evidence to prove she was not.

i)   Plaintiff had three lawyers he was working with at the time. All three of them pressured him to sign the agreement. Plaintiff was reluctant and can provide evidence by waiving attorney-client privilege limited to this specific question, if needed. The main thing Plaintiff hoped to gain was a speedy liquidation of the bank, so the customers could get their money back quickly, and with remaining capital plus funds from the asset sale to Qenta, Plaintiff expected some proceeds would be left to recover some of the investment loss. The Plaintiff's lawyers represented to him it was especially important to cooperate with the Commissioner to show that he was innocent of money laundering and tax evasion. The fear of the burden of an unjust criminal investigation in PR as well as everything else going on, was a heavy toll for Plaintiff. Plaintiff's lawyers also represented that by avoiding the adversarial administrative process, Plaintiff could try again to get the Commissioner to approve the stock sale of the bank, as she (that is, Ms. Zequeira) & OCIF would be, somehow, more sympathetic to the cause. Plaintiff was also told that his mere suspicions that the Commissioner was being dishonest did not count and since at the time Plaintiff did not have any actual evidence to back up that suspicion, Plaintiff reluctantly signed the agreement under duress.

(1)  This release is limited to claims made by Euro Pacific Bank, the entity, its directors, or officers, that specifically relate to claims and damages that Euro Pacific Bank itself may have, not to claims made by Mr. Schiff for damages he personally suffered individually or as a shareholder. It reads in the pertinent way:

(a)  Euro Pacific, _its directors and officers_, do hereby release and forever discharge the OCIF, its attorneys, insurers, assignees, transferors, transferees, principals, partners, officers, directors, employees, agents servants, subsidiaries, parent corporations, affiliates, successors, stockholders, agents and representatives, including the Trustee (the "Releasee(s)"), from any and all claims, demands, damages, debts, liabilities, obligations, contracts, agreements, causes of action, suits, of whatever nature, character or description, that Euro Pacific may have or may hereafter have or claim to have against each other Releasee(s) arising out of or related to the facts or allegations made in any of the papers or pleadings filed in the Complaint and any conduct, including actions and omissions, to enforce the Complaint.

(b)  Section V, paragraph 11, the mutual non-disparagement clause, not only applies to directors, but it specifically reads that it also applies to "Peter Schiff." So that would include Plaintiff in any capacity, including his capacity as a shareholder. If the director alone were sufficient to include Plaintiff at all times, there would have been no reason to name the Plaintiff personally in that particular paragraph, as the Plaintiff was a director. However, the release, which is in paragraph 18, does not name Plaintiff personally as a releasing

party. It only references directors. This is in sharp contrast to paragraph 11, which applied to both directors and Peter Schiff.

(2) The Consent Order with the release was signed by Plaintiff once, on behalf of Euro Pacific Bank. Shareholders cannot sign for corporations. Only officers or directors can sign on behalf of a corporate entity. However, the liquidation plan, signed on Sept. 1st, about three weeks later, was signed by Plaintiff twice. Once on behalf of the bank itself, with Plaintiff signing in his capacity as a director and a second time by Plaintiff personally, in his capacity as a shareholder. The fact that Plaintiff specifically signed off on the liquidation plan personally as a shareholder, as well as on behalf of the bank in his capacity as a director, but only singed the Consent Order in his capacity as a director, proves the release applies to Plaintiff as director only and does not apply to him as a shareholder.

(3) At the end, the agreement before Plaintiff's signature reads "I have been authorized to consent to the liquidation order for and on behalf of Euro Pacific." It is clear that Plaintiff was not signing on behalf of himself as an individual shareholder of Euro Pacific. Also, the main reason Plaintiff agreed to accept the liquidation of the bank, was that the Commissioner had already rejected the stock sale of the bank shares. Only after that rejection was notified was the Plaintiff consented *as a director* to the liquidation of the bank. And even that consent was evidently given under duress.

  (a) This is a lawsuit by a shareholder and owner for his personal loss, based on a conspiracy to deny him his constitutional rights and unconstitutionally deprive him of his property.

(4) Mr. Schiff's current claim is not as a director of Euro Pacific Bank nor as an officer (that he was not when signing the release) but as a its sole stockholder and owner as well in his personal and professional capacity for the damages caused to his financial & economic position and personal & professional reputation. Also, this claim does not relate to any damage suffered by Euro Pacific Bank, but only to that damage suffered by Mr. Schiff personally. This is a civil rights action seeking redress for damages arising from the wrongful and negligent conduct of the defendants, which resulted in financial and reputational harm to the Plaintiff himself. The actions of the IRS and OCIF deprived the Plaintiff of property without due process. None of these personal claims are covered by the release.

(5) Also, since the conspiracy was not uncovered by Plaintiff until April 2024, said conspiracy was not known to Plaintiff when he signed the release, and clearly does not fall within "facts or allegations made in any of the papers or pleadings filed in the Complaint and any conduct, including actions and omissions, to enforce the Complaint," therefore, it falls outside the scope of the release, even with respect claims made by the bank itself, and to Mr. Schiff in his capacity as a director.

5) Causes of Action

a) Count I: Tortious Interference with Business Relations

    i) The defendants unlawfully interfered with the Plaintiff's business, leading to the loss of a $17.5 million sale to Qenta in 2022. Under Puerto Rican law, tortious interference is actionable when defendants act with wrongful intent, which applies here.

b) Count II: Defamation (Slander and Libel)

    i) Statements made by Mr. Jim Lee, representing the IRS and OCIF (by its omission) in the June 2022 press conference falsely implied criminal wrongdoing by the Plaintiff. These statements, widely published, caused significant reputational harm at that moment and they are still causing damages to Plaintiff because the bank has not been liquidated as of today and echoes of the conference still haunting Plaintiff's reputation today with bank's customers; blaming Plaintiff under the belief Mr. Lee's conference innuendos were true as the reason the bank has not been able to pay their proceeds. The defamation standard for public officials under *New York Times Co. v. Sullivan, 376 U.S. 254 (1964)*, requires actual malice, which can be demonstrated here.

    (1) To clarify, this is not another defamation lawsuit as far as The Age and their reporters are concerned. Plaintiff already sued them and won, thus proving they lied. They are being included as co-conspirators in tortious interference with the sale of the bank. First, because it is believed that the Age reporters (possibly Nick McKenzie of the N.Y. Times as well), may have been the co-instigators of the conspiracy. They may have called in a favor from their confidential source at either the IRS or ATO, to take adverse action against the bank, to both validate their initial stories, and to incorporate that action, as was in fact done, into their defense against Mr. Schiff's defamation lawsuit, which they ultimately lost. Second, for their active participation in the conspiracy by using the media to create the false impression that the bank was guilty of money laundering and tax evasion. The articles that appeared in the Age and N.Y. Times immediately following the June 30 2022 press conference included multiple quotes from Mr. Jim Lee, Mr. William Day, and Mr. Simon York, that falsely implied that the bank was guilty of tax evasion and money laundering, and which tied the shutdown of the bank to the J5's Atlantis Investigation, but omitted the statement from Ms. Zequeira that OCIF's did not conclude that the bank facilitated money laundering or tax evasion, and that the action against the bank "was not based on allegations of money laundering or any financial crimes." Also, Plaintiff learned from discovery in his winning defamation lawsuit, that Grieve McKenzie, and Goldstein deliberately fabricated evidence and lied about what witnesses told them to deliberately create the false impression that the bank and Plaintiff were guilty of crimes their own investigation proved they did not commit. This will also provide the Court with an opportunity to provide a complete judgment, saving judicial resources, and the opportunity to

discover further evidence of the full conspiration. This is not about if The Age and their reporters lied, they did, but about the reasons they had for lying.

(2) The situation is almost the same for the NY Times and its reporters, but with the difference they have not been sued for defamation and are not being sued for defamation or libel but as a co-conspirator in tortious interference with the sale of the bank.

   (a) Tortious interference does overlap a little with defamation, but it targets direct business harm rather than reputational damage alone as per 1st Circuit case law has established, Tortious interference can indeed overlap with defamation when the interference is based on defamatory statements. In the case of Wilcox Indus. Corp. v. Hansen, 2012 DNH 92, the United States District Court for the District of New Hampshire noted that inducing a third person by defamatory statements not to do business with the plaintiff can constitute wrongful conduct sufficient to support an interference with a prospective contractual relationship claim. Wilcox Indus. Corp. v. Hansen, 2012 DNH 92. This indicates that defamatory statements can be a basis for tortious interference claims. Similarly, in Sonicsolutions Algae Control, LLC v. Diversified Power Int'l, LLC, 2024 U.S. Dist. LEXIS 44736, the United States District Court for the District of Massachusetts acknowledged that defamation is a predicate improper act for tortious interference, suggesting that reputational damage through defamation can be a component of tortious interference claims. Sonicsolutions Algae Control, LLC v. Diversified Power Int'l, LLC, 2024 U.S. Dist. LEXIS 44736. Furthermore, in Mullane v. Breaking Media, Inc., 433 F. Supp. 3d 102, the United States District Court for the District of Massachusetts highlighted that claims for tortious interference with business relations or prospective economic advantages must allege improper motive or means, which can include the commission of defamation. Mullane v. Breaking Media, Inc., 433 F. Supp. 3d 102. Therefore, while tortious interference primarily targets direct business harm, it can also encompass reputational damage when defamatory statements are involved. This overlap is supported by case law in the 1st Circuit. Wilcox Indus. Corp. v. Hansen, 2012 DNH 92, Sonicsolutions Algae Control, LLC v. Diversified Power Int'l, LLC, 2024 U.S. Dist. LEXIS 44736, Mullane v. Breaking Media, Inc., 433 F. Supp. 3d 102

   (b) Tortious interference involves conduct aimed directly at undermining existing or prospective business relationships, not merely disparaging the plaintiff. In the 1st Circuit, case law supports this distinction. In " Wilcox Indus. Corp. v. Hansen, supra, the United States District Court for the District of New Hampshire noted that inducing a third person by fraudulent

misrepresentations or defamatory statements not to do business with the plaintiff can constitute wrongful conduct sufficient to support an interference with a prospective contractual relationship claim. Wilcox Indus. Corp. v. Hansen, 2012 DNH 92. This indicates that tortious interference involves actions that directly impact business relationships. Additionally, in " Conformis, Inc. v. Aetna, Inc., 58 F.4th 517," the United States Court of Appeals for the First Circuit outlined the elements required to establish a claim for tortious interference with advantageous relations, emphasizing the need for intentional and improper interference with a business relationship, which goes beyond mere disparagement. Conformis, Inc. v. Aetna, Inc., 58 F.4th 517. Furthermore, in " Singh v. Blue Cross/Blue Shield of Mass., Inc., 308 F.3d 25," the United States Court of Appeals for the First Circuit reiterated that the interference must be through improper motive or means, highlighting the direct impact on business relationships rather than just reputational harm. Singh v. Blue Cross/Blue Shield of Mass., Inc., 308 F.3d 25. These cases collectively illustrate that tortious interference in the 1st Circuit is focused on conduct that directly undermines business relationships, distinguishing it from defamation, which primarily concerns harm to reputation.

(c) In contraposition, injurious falsehood claims require proof that the defendant knowingly published false information harmful to economic interests, which can help distinguish such claims from defamation. This is supported by case law in the 1st Circuit. In the case of Hi-Tech Pharms., Inc. v. Cohen, the United States District Court for the District of Massachusetts outlined the elements required to prove commercial disparagement (a form of injurious falsehood). The plaintiff must demonstrate that the defendant published a false statement with knowledge of its falsity or with reckless disregard for its truth, and that this publication resulted in pecuniary loss to the plaintiff's economic interests. Hi-Tech Pharms., Inc. v. Cohen, 277 F. Supp. 3d 236. This aligns with the requirement that the defendant knowingly published false information. Additionally, in Jorgensen v. Massachusetts Port Authority, the United States Court of Appeals for the First Circuit noted that Massachusetts law requires proof of actual harm to the plaintiff's business reputation due to injurious falsehoods. The court referenced Sharratt v. Housing Innovations, Inc., which stated that intentional falsehoods causing economic harm are actionable, even if they are not defamatory. Jorgensen v. Massachusetts Port Authority, 905 F.2d 515. These cases support the assertion that injurious falsehood claims focus on the economic consequences of misleading information, distinguishing them from defamation claims which primarily address harm to reputation.

(d) When speech or expression causes intentional infliction of emotional distress and economic harm, especially if done with knowledge of potential economic fallout, this can support a conspiracy framework if intent and harm to business prospects are shown. In the case of Dynamic Image Techs. v. United States, the United States District Court for the District of Puerto Rico found that the claim for intentional infliction of emotional distress was cognizable under Puerto Rico law, although the plaintiff corporation could not have suffered from emotional distress. Dynamic Image Techs. v. United States, 18 F. Supp. 2d 146. This indicates that such claims are recognized within the jurisdiction of the Federal District Court for the District of Puerto Rico. Additionally, in Planned Parenthood v. Am. Coalition of Life Activists, the United States District Court for the District of Oregon discussed the sufficiency of allegations to support a conspiracy claim under RICO, emphasizing that plaintiffs had met their initial pleading burden by providing fair notice to defendants of their RICO conspiracy against them. Planned Parenthood v. Am. Coalition of Life Activists, 945 F. Supp. 1355. This suggestive case supports the notion that a conspiracy framework can be established if intent and harm to business prospects are shown. Furthermore, the principles of law summarized in Restatement (Second) of Torts § 46, also support the claim for intentional infliction of emotional distress when the conduct is extreme and outrageous, causing severe emotional distress. Donastorg v. Daily News Publishing Co., Inc., 63 V.I. 196.

(e) Now, Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) establishes the standard for conspiracy in civil claims, requiring a clear agreement or conduct that is "plausibly suggestive" of conspiracy. The Twombly decision heightened the pleading standards in civil cases, replacing the previous "no set of facts" standard from Conley v. Gibson with a plausibility standard. This requires plaintiffs to plead enough facts to raise a reasonable expectation that the discovery will reveal evidence of the underlying claim. Credit Acceptance Corp. v. Pinkney, 80 Misc. 3d 1093, § 7.03. In the context of antitrust claims, Twombly specifically requires that the complaint must contain enough factual matter to suggest that an agreement was made, which means that the allegations must be plausible rather than merely conceivable. Williams v Citigroup, Inc., 104 A.D.3d 521. This standard has been extended to all federal civil claims by the Supreme Court in Ashcroft v. Iqbal, which requires that the complaint show a right to relief that is plausible as opposed to merely possible. Credit Acceptance Corp. v. Pinkney, 80 Misc. 3d 1093, § 7.03, Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868, 2009 U.S. LEXIS 3472, 77 U.S.L.W.

4387, 2009-2 Trade Cas. (CCH) P76,785, 73 Fed. R. Serv. 3d (Callaghan) 837, 21 Fla. L. Weekly Fed. S 853.

(f) The courts have recognized that media reports can give rise to claims beyond defamation, such as tortious interference, when reports cause economic damage by misrepresenting the plaintiff's legal or financial status. This could support an argument for claiming tortious interference if the media's reporting harmed a pending business sale" and it is partially supported by case law in the 1st Circuit and the Federal District Court for the District of Puerto Rico. In the case of Emerito Estrada Rivera-Isuzu De P.R., Inc. v. Consumers Union of United States, Inc., 233 F.3d 24, the plaintiff sought damages for lost sales on the theory of intentional interference with business relations due to disparaging statements made by the defendant. However, the United States Court of Appeals for the First Circuit dismissed the claim because the complaint did not identify any "specific existing relationships" that were interfered with by the statements. Emerito Estrada Rivera-Isuzu De P.R., Inc. v. Consumers Union of United States, Inc., 233 F.3d 24. We have identified such existing relationships in this claim for each and every one of the defendants.

(g) The Restatement (Second) of Torts § 623A clarifies that injurious falsehood includes the publication of untrue statements that harm economic interests if done with malice or reckless disregard for the truth. According to § 623A, one who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if (a) the publisher intends for the publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (b) the publisher knows that the statement is false or acts in reckless disregard of its truth or falsity Warren Trust & Marietta Trust v. United States, 107 Fed. Cl. 533, CMI, Inc. v. Intoximeters, Inc., 918 F. Supp. 1068, Neshewat v. Salem, 173 F.3d 357.

(h) In the 1st Circuit and the Federal District Court for the District of Puerto Rico, there is case law supporting the responsibility of entities, including the media, not to omit material facts when such omissions might affect public perception, particularly in financial or legal matters. Such omissions can indeed be grounds for claims of economic harm. In Hoff v. Popular, Inc., the U.S. District Court for the District of Puerto Rico held that the company's financial statements were materially misstated due to the omission of necessary valuation allowances, which misled investors. The court emphasized that under the Private Securities Litigation Reform Act (PSLRA), a misleading statement or omission occurs when

a material fact is not disclosed, making the statements misleading in light of the circumstances. Hoff v. Popular, Inc., 727 F. Supp. 2d 77.

c) Count III:

    i) Violation of 42 USC 1983 – violation of Plaintiff's constitutional due process rights under 4th and 5th Amendments and to Equal Protection under 14th Amendment, and Violation of 42 USC 1985(3) – alleged conspiracy to violate Schiff's constitutional rights by Defendant Ms. Zequeira and co-conspirator Lee and unknown others at IRS and J5 and OCIF and all other defendants in various capacities as co-conspirators.

        (1) Violation of 42 U.S.C. § 1983:

            (a) Claim Under 42 U.S.C. § 1983 – Constitutional Violations

                (i) 42 U.S.C. § 1983 provides a remedy for individuals whose constitutional rights have been violated by persons acting "under color of state law." While this statute typically applies to state actors, it can be extended to federal actors when plaintiffs argue, like this case, that the violation involved cooperation with state actors.

                (ii) Elements for a § 1983 Claim:

                    1.  Deprivation of a Constitutional Right: The plaintiff is alleging that he was deprived of a constitutional right (Unlawful seizure of property - the bank- without due cause for this case).

                    2.  Violation of Fourth Amendment rights: Unlawful seizure of property.

                    3.  Violation of Fifth Amendment rights: Due process violations (procedural and substantive).

                        a.  Procedural and substantive due process under the Fifth Amendment have distinct characteristics and implications. Procedural due process focuses on the fairness of the procedures used by the government when it deprives an individual of life, liberty, or property. It requires that the government provide notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Castellar v. McAleenan, 388 F. Supp. 3d 1218*. Procedural due process violations are not complete until the state fails to provide due process, meaning that the state can cure procedural deprivation by providing a later procedural remedy. *McKinney v. Pate, 20 F.3d 1550*.

b.  Substantive due process, on the other hand, protects fundamental rights from government interference, regardless of the procedures used. A violation of substantive due process is complete when the infringement occurs, and no amount of process can justify it. *McKinney v. Pate, 20 F.3d 1550*. Substantive due process rights are typically protected against arbitrary and irrational government actions that are so egregious and outrageous that they shock the conscience. *Daugherty v. Sheer, 248 F. Supp. 3d 272*.

    i.  The remedies for substantive due process violations are usually compensatory damages, whereas procedural due process violations often seek equitable relief, such as reinstatement or a properly conducted hearing. *McKinney v. Pate, 20 F.3d 1550*.

*c.*  In summary, while procedural due process ensures fair procedures before deprivation of rights, substantive due process protects against certain government actions regardless of the procedures used. Both components are essential to the Fifth Amendment's guarantee of due process, but they address distinct aspects of government conduct and provide diverse types of remedies. *McKinney v. Pate, 20 F.3d 1550, Castellar v. McAleenan, 388 F. Supp. 3d 1218, Daugherty v. Sheer, 248 F. Supp. 3d 272.*

(iii) The plaintiff claims that the IRS and OCIF deprived him of property (his financial institution) without due process, violating his Fifth Amendment rights.

    1.  Procedural Due Process Violation:

        a.  Procedural due process ensures that before the government deprives someone of property, notice and an opportunity to be heard are required. Here, the plaintiff alleges:

        b.  Plaintiff was not given proper notice of the denial of his bank's license renewal prior to the June 2022 cease-and-desist order.

            i.  His offer to inject $7 million in capital was rejected by the OCIF Commissioner, who assured him that the bank's current capital level, though below the statutory required minimum, was sufficient for the bank to operate prior to the completion of the sale to Qenta. Then, without warning, Ms. Zequeira and OCIF improperly used the bank's low capital as a pretense to issue a

cease-and-desist against the bank for insufficient capital, without once giving the plaintiff a chance to clear the capital difference by adding the funds previously advised to him were not needed.

ii. OCIF denied the stock sale, which would have yielded $17.5 million, but later approved a much smaller asset sale, resulting in significant economic loss.

c. Key Arguments:

i. The government's actions (blocking the stock sale and closing the bank) required prior notice and a meaningful opportunity to address concerns. Mathews v. Eldridge, 424 U.S. 319 (1976), requires balancing the individual's interest, risk of erroneous deprivation, and the government's interest. OCIF's refusal to reconsider the stock sale likely violated this principle.

ii. Mathews v. Eldridge established a three-part balancing test to determine the specific dictates of due process in administrative procedures. This test requires consideration of: (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that additional or substitute procedural requirements would entail *S.C. v. New Jersey Dept. of Children & Families, 242 N.J. 201, In re State, 556 S.W.3d 821, Lime Lounge, LLC v. Zoning Bd. of Adjustment of Des Moines, 927 N.W.2d 701*.

iii. The requirement for notice and an opportunity to be heard is a fundamental aspect of due process, as highlighted in Mathews v. Eldridge. The case emphasizes that even if an evidentiary hearing is not always required, the affected individual must be given a chance to assert their claim before any administrative action is taken. *S.C. v. New Jersey Dept. of Children & Families, 242 N.J. 201*. Therefore, OCIF's refusal to reconsider the stock sale without providing prior notice and a meaningful opportunity to address concerns would likely violate the due

process principles established in *Mathews v. Eldridge S.C. v. New Jersey Dept. of Children & Families, 242 N.J. 201, In re State, 556 S.W.3d 821, Lime Lounge, LLC v. Zoning Bd. of Adjustment of Des Moines, 927 N.W.2d 701.*

iv. In Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985), the U.S. Supreme Court established that an individual with a protected property interest is entitled to notice and an opportunity to be heard before being deprived of that interest. The case was about a public employee facing termination, requiring a pre-termination hearing that need not be elaborated but must provide notice and an opportunity to respond to the charges. Applying this to the context of OCIF and the bank's potential insolvency, the bank might indeed be entitled to a hearing before liquidation, as the deprivation of property interests typically requires due process protections. Similarly, the plaintiff, as an owner, would be entitled to an independent hearing to address the deprivation of his property interest. The essence of due process, as highlighted in Loudermill, is the requirement for notice and an opportunity to be heard before any significant property interest is deprived. Even if OCIF believed insolvency was an issue, the bank might have been entitled to a hearing before liquidation. The plaintiff, as an owner, was, on the other hand, entitled to an independent hearing as his property was being deprived.

v. Plaintiff's personal emotional duress situation and improper legal advice confound this process. Also, the only hearing he was offered related to the liquidation of the bank, and not to the rejection of the stock sale of the bank to Qenta. Since the Commissioner made it clear that she would not approval the sale of the bank to any buyer, no matter how qualified, liquidation was a the only viable option Plaintiff had. Due to the allegations in the media, which were exacerbated by the comments of the defendants at the press conference, the bank was losing over $250,000 per month. Losses that the Plaintiff was personally covering. The only way the bank would ever return to profitability would be to get out from under the cloud of money laundering and tax evasion, which could only be

achieved with a new name, a new board of directors, and new management. So long as Mr. Schiff owned the bank it would be hemorrhaging money. So, he agreed to the liquidation of the bank as the only means to stop the bleeding.

vi. Under Cleveland Board of Education v. Loudermill, the Supreme Court held that due process requires that an individual be given an opportunity for a hearing before being deprived of any significant property interest, which included employment in that case. Specifically, the Court mandated that a tenured public employee must receive oral or written notice of the charges against them, an explanation of the employer's evidence, and an opportunity to present their side of the story before termination. *Green Bay Professional Police Ass'n v. City of Green Bay, 407 Wis. 2d 11, State v. Conn. State Univ. Org. of Admin. Fac., 349 Conn. 148, Fed. Educ. Ass'n - Stateside Region v. DOD, 841 F.3d 1362.*

vii. Nonetheless, in the context of bank liquidation, the necessity of a pre-deprivation hearing can be influenced by the urgency of the situation. For instance, in Columbian Financial Corp. v. Stork, the court acknowledged that no pre-deprivation hearing is necessary when there is a need for swift or expedited action, such as when a bank is declared insolvent. The court held that the denial of a pre-deprivation hearing did not violate a clearly established constitutional right under such urgent circumstances. *Columbian Fin. Corp. v. Stork, 811 F.3d 390.*

viii. Therefore, while Loudermill establishes a general requirement for a pre-deprivation hearing, exceptions exist in cases where immediate action is necessary to prevent serious losses, such as in the case of bank insolvency. In such a scenario, the Plaintiff himself and the bank may not be entitled to a pre-deprivation hearing before liquidation. *Columbian Fin. Corp. v. Stork, 811 F.3d 390.*

ix. However, Plaintiff is contesting the need for "immediate action" as, and we repeated here for convenience: "If the bank was truly "critically insolvent" so that it required a cease-and-desist order "summary emergency action that seeks to prevent an

imminent danger", why did Ms. Zequeira and OCIF wait three months to issue it?" (A delay Plaintiff did not even know about until April of 2024). In such an alternate scenario, Plaintiff himself and maybe, but not necessarily the bank, may have been entitled to a pre-deprivation hearing before liquidation.

x.  Here, we are postulating the appointed Trustee should have represented the bank's interests (defending the bank's customers and their deposits, as well as its creditors, etc.) in contraposition to the interest of OCIF in a second angle and the Plaintiff in a third angle viewpoint. That did not happen.

xi.  Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982): A procedural right cannot be arbitrarily denied. Here, OCIF invited a reconsideration motion but allegedly never intended to approve it, violating due process. The Court emphasized that the state must accord due process when it terminates a claim for failure to comply with a reasonable procedural or evidentiary rule. The case involved a situation where the plaintiff's claim was dismissed due to the state's failure to convene a hearing within the statutory period, which the Court found to be a denial of due process, but Logan does not discuss *the intent* behind procedural invitations but rather focuses on the procedural safeguards required to protect an individual's rights. The Court in Logan did not address a scenario where a motion was invited with no intention of approval, but it did establish that procedural rights cannot be arbitrarily denied without due process. Plaintiff, nevertheless, understands the intention to deny the due process is a natural extension of Logan.

*xii.* A procedural right cannot be arbitrarily denied without violating due process. The U.S. Supreme Court has consistently held that due process requires that individuals be given notice and an opportunity to be heard before being deprived of life, liberty, or property. This principle is evident in several cases. In Logan v. Zimmerman Brush Co., the Court emphasized that the Due Process Clause grants the aggrieved party the opportunity to present his case and have its merits fairly judged. The Court stated that "some form of hearing" is required before the owner

is finally deprived of a protected property interest. *Logan v. Zimmerman Brush supra.* Similarly, in *Cleveland Bd. of Educ. v. Loudermill, supra,* the Court reiterated that the right to due process is conferred by constitutional guarantee and that a property interest cannot be deprived without appropriate procedural safeguards. *Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532.* In Logan v. Zimmerman Brush Co., the U.S. Supreme Court held that procedural due process requires that an individual be given an opportunity to be heard "at a meaningful time and in a meaningful manner". The Court emphasized that the state must provide procedural safeguards to protect an individual's property interest, which in this case was Logan's claim under the Illinois Fair Employment Practices Act. *Logan v. Zimmerman Brush Co., 455 U.S. 422.* The Court found that Logan was denied due process when his claim was dismissed due to the Commission's failure to hold a timely conference, a matter beyond Logan's control. *Logan v. Zimmerman Brush Co., 455 U.S. 422.*

xiii. Moreover, in County of Sacramento v. Lewis, the Court noted that the touchstone of due process is the protection of the individual against arbitrary action of government, whether it involves a denial of fundamental procedural fairness or the exercise of power without reasonable justification County of Sacramento v. Lewis, 523 U.S. 833. This principle was also highlighted in Zinermon v. Burch, where the Court explained that a procedural due process claim is not complete unless and until the State fails to provide due process. *Zinermon v. Burch, 494 U.S. 113.*

xiv. In Kremer v. Chem. Constr. Corp., the Court found that state procedures for adjudicating a claim of job discrimination were sufficient under the Due Process Clause of the Fourteenth Amendment, as long as the procedures allowed for a full opportunity to present charges, rebut evidence, and seek judicial review to ensure that the determination was not arbitrary and capricious. *Kremer v. Chem. Constr. Corp., 456 U.S. 461.*

xv. Applying this to the scenario where OCIF invited a reconsideration motion but allegedly never intended to approve it, it would similarly violate due process if the procedural right to reconsideration was arbitrarily denied. The essence of due process, as highlighted in Logan, is the provision of a fair procedure, and any arbitrary denial of such a procedural right would be inconsistent with the due process requirements established by the Fourteenth Amendment. *Logan v. Zimmerman Brush Co., 455 U.S. 422.*

xvi. Therefore, the principles of Logan v. Zimmerman Brush Co. support the assertion that arbitrarily denying a procedural right, such as a reconsideration motion, would violate due process. *Logan v. Zimmerman Brush Co., 455 U.S. 422.*

xvii. These cases collectively underscore that procedural rights are fundamental to due process and cannot be arbitrarily denied without violating constitutional protections.

xviii. Application: The bank's closure and blocked sale without notice constitutes a clear deprivation of Plaintiff's procedural rights. The press conference further harmed the plaintiff by implying illegal activity, thus depriving him of his presumption of innocence and exacerbating financial and reputational damage.

(iv) Substantive Due Process Violation

1. Substantive due process protects against arbitrary government actions that lack a legitimate purpose. Plaintiff claims:

   a. OCIF's decision to reject the sale and shut down the bank was arbitrary, as the bank had no debt and excess cash on hand that exceeded all liabilities, including those owed to depositors.

   b. The defendants acted to "set an example" without actual evidence of wrongdoing to save face after a failed IRS/J5 investigation.

   c. Key Arguments:

      i. *County of Sacramento v. Lewis, 523 U.S. 833 (1998):* Actions that "shock the conscience" violate substantive due process. Here, the government shut down a functioning bank without

legitimate cause. The Court emphasized that only the most egregious official conduct offends substantive due process.

ii. The plaintiff's claim that OCIF's decision to reject the sale and shut down the bank constitutes a substantive due process violation is supported by relevant legal precedents. Substantive due process protects against arbitrary government actions that lack a legitimate purpose and are so egregious that they "shock the conscience." In County of Sacramento v. Lewis, the U.S. Supreme Court held that actions that "shock the conscience" violate substantive due process. County of Sacramento v. Lewis, 523 U.S. 833.

iii. *Zinermon v. Burch, 494 U.S. 113 (1990):* Misuse of governmental power without proper procedures violates substantive due process.

iv. The OCIF's denial of the capital injection ensured the bank's insolvency, further showing arbitrary intent.

v. Application: OCIF's rejection of the stock sale and hasty asset sale deprived the plaintiff of millions in value, harming creditors, and customers. The refusal to consider capital injections, as well as highly experienced banking professionals to operate the bank, shows a deliberate effort to prevent the bank's survival—constituting an arbitrary and unjustified deprivation of property.

vi. The plaintiff's argument that OCIF's actions were arbitrary and lacked legitimate cause aligns with the principles established in the above cited cases. The claim that the defendants acted to "set an example" without actual evidence of wrongdoing, and the refusal to consider capital injections, could be seen as arbitrary and capricious actions that deprived the plaintiff of property without a legitimate governmental objective. This is further supported by the First Circuit's interpretation in Marrero-Rodríguez v. Municipality of San Juan, which states that substantive due process is violated by executive action that is arbitrary or conscience-shocking Marrero-Rodríguez v. Municipality of San Juan, 677 F.3d 497.

vii. Additionally, the statutory framework under 5 USCS § 706 allows courts to set aside agency actions that are arbitrary, capricious, or an abuse of discretion. § 706. Scope of review. This supports the plaintiff's claim that OCIF's rejection of the stock sale and hasty asset sale, which deprived the plaintiff of significant value, could be considered arbitrary and unjustified.

viii. In conclusion, the plaintiff's claim that OCIF's actions constitute a substantive due process violation is supported by the cited legal precedents and statutory provisions, which emphasize protection against arbitrary and conscience-shocking government actions.

(v)  Violation of Fourteenth Amendment rights: Equal protection violations (typically applied to state actors, but this can also be argued through state-federal cooperation/leadership in certain cases, like this case).

1.  Defendants Acting Under Color of State Law: The plaintiff alleged that the defendants were acting "under color of state law," meaning they were acting with authority given by the state or as state agents. This can include private individuals (like the Trustee and Ms. Zequeira & Mr. Lee in their private capacity) as well as federal actors conspiring with state officials to deprive someone of their rights as in this case.

2.  Causation: The plaintiff alleged that the defendant's conduct directly caused the deprivation of the plaintiff's rights. In this case, Plaintiff will show that Ms. Zequeira, Mr. Lee, the J5 and other individuals involved at the IRS and OCIF were acting in concert to violate the plaintiff's constitutional rights.

(vi) Protected Class Membership (for Equal Protection Claim): The plaintiff alleges violation of the Equal Protection Clause (14th Amendment); he established that he is a member of a protected class, such as based on race, religion, and because these two in conjunction to, or separate of, his political views and public speeches, he will prove he was discriminated against, at least in part, because of his membership in this class and his public political speech.

1.  Political speech is protected under 42 U.S.C. § 1983. The U.S. Supreme Court in Heffernan v. City of Paterson held that a city police officer who was demoted based on the city's mistaken belief that the officer was

engaging in political speech was entitled to seek relief under 42 U.S.C. § 1983. The Court emphasized that the First Amendment generally prohibits government officials from dismissing or demoting an employee because of the employee's engagement in constitutionally protected political activity, and 42 U.S.C. § 1983 authorizes a lawsuit by a person deprived of a right secured by the U.S. Constitution. *Heffernan v. City of Paterson, 578 U.S. 266.*

2. Regarding 42 U.S.C. § 1985 (3), the statute does not explicitly protect political speech. Section 1985(3) addresses conspiracies to deprive individuals of equal protection of the laws or equal privileges and immunities under the laws, but it does not specifically mention political speech as a protected category. § 1988. Proceedings in vindication of civil rights. Therefore, while political speech is protected under 42 U.S.C. § 1983, it is not explicitly protected under 42 U.S.C. § 1985(3).

(vii)    **Constitutional Violations**: The Plaintiff, Mr. Peter Schiff, alleges that the actions by IRS & J5 officials (Mr. Jim Lee and others) and OCIF (Ms. Natalia Zequeira Díaz) violated his due process rights under the **4th and 5th Amendments** and the **Equal Protection Clause of the 14th Amendment**. Specifically, Plaintiff claims that the wrongful shutdown of his financial institution and the defamatory press conference violated his rights to due process by depriving him of property (the bank's stock fair market value) without proper legal procedure and based on false criminal accusations.

1. **State Action Requirement**: As stated above, under § 1983, the Plaintiff demonstrated that the defendants were acting "under color of state law." Both IRS and OCIF acted in their official capacities, implying state action. The involvement of OCIF, a Puerto Rican agency, in executing actions under IRS directives would likely meet this criterion.

(2) **Violation of 42 U.S.C. § 1985(3)**:

(a) **Claim Under 42 U.S.C. § 1985(3) – Conspiracy to Violate Constitutional Rights**

(i) **42 U.S.C. § 1985(3)** allows for a civil action if two or more persons conspire to deprive someone of their constitutional rights, particularly if the motivation is based on race or another protected class status. This claim alleges that the defendants conspired to violate the plaintiff's civil rights based on their membership in a protected class.

(b) **Elements for a § 1985(3) Claim:**

(i) **Conspiracy**: The plaintiff alleged that the defendants entered into a conspiracy or agreement with the intent to deprive the plaintiff of equal protection and/or equal privileges and immunities under the law. In this case, it is alleged that Ms. Zequeira and Mr. Lee, along with others at the IRS and OCIF, conspired to violate the plaintiff's rights.

(ii) **Class-Based Animus**: The plaintiff will prove that the conspiracy was motivated by "class-based, invidiously discriminatory animus." In other words, the conspiracy was driven, at least partially, by racial, religious, or other discriminatory motives. The plaintiff's claim shows that he is a member of a protected class (based on race & religion) and that the conspiracy was motivated, at least in part, by this discriminatory animus.

(iii) **Overt Acts in Furtherance of the Conspiracy**: The plaintiff will provide and discover evidence of actions taken by the conspirators in furtherance of the conspiracy. This includes specific actions by Ms. Zequeira, Mr. Lee, and others at the IRS/J5 and OCIF that demonstrate they worked together to violate the plaintiff's rights.

(iv) **Deprivation of a Constitutional Right**: Similar to the § 1983 claim, the plaintiff will prove that was deprived of a constitutional right, such as due process (Fifth Amendment) and unlawful seizure (Fourth Amendment). The plaintiff will also show that this deprivation was caused by the actions of the conspirators.

(v) **Alleged conspiracy Allegations**: The complaint alleges that Mr. Jim Lee (IRS) and Ms. Natalia Zequeira Díaz (OCIF), along with unnamed individuals from IRS/J5 and OCIF, conspired to violate Schiff's constitutional rights by using false accusations to destroy his business. Section 1985(3) addresses conspiracies that deprive individuals of equal protection or equal privileges under the law. Plaintiff claims that he is part of a protected class, and that the alleged conspiracy was motivated, in part, by discriminatory intent.

(vi) **Proof of Alleged conspiracy**: To support a § 1985(3) claim, Mr. Schiff will provide evidence that there was an agreement or "meeting of the minds" between Mr. Lee, Ms. Zequeira, and other co-conspirators. In addition to the evidence already in possession, Plaintiff will also request proper discovery to further evidence this claim. The **FOIA documents** obtained by Plaintiff in April 2024, revealing IRS-OCIF coordination and concealment of the investigation, if unredacted, may provide base evidence of such an alleged conspiracy, among further discoveries to be made. Plaintiff claims that the collaboration between IRS and OCIF went beyond routine procedure, showing clear intent to wrongfully shut down the bank and defame him.

(vii)    **Discriminatory Animus**: Plaintiff's claims that he is part of a protected class and can invoke the requirement that the alleged conspiracy be motivated, at least partially, by some form of class-based, invidiously discriminatory animus (racial, religious, or another identifiable group characteristic and/or political speech).

1. Plaintiff also claims his first amendment rights of free speech was one of the reasons he was targeted for investigation by the IRS & J5 in the first place for expressing his political beliefs. Plaintiff is a well-known public critic of the IRS, the income tax in general, and AML laws in particular that he feels are violating individual privacy. Though overly critical of these laws, Plaintiff abides by them. In summary, Plaintiff criticizes those laws but have always followed them. Yet, Plaintiff claim he was unconstitutionally targeted and punished for expressing his views.

2. In support of the plaintiff's allegation that the IRS sometimes targets individuals and entities known to be critics of its practices, several cases and statutes provide relevant precedents and legal principles area quoted. In "United States v. NorCal Tea Party Patriots (In re United States)," the 6th Circuit Court of Appeals addressed allegations that the IRS used political criteria to target applications for tax-exempt status filed by Tea Party groups. The court noted that the IRS took significantly longer to process these applications and demanded unnecessary information, which was seen as mistreatment based on political views. *United States v. NorCal Tea Party Patriots (In re United States), 817 F.3d 953.* Similarly, in "NorCal Tea Party Patriots v. IRS," the plaintiffs alleged that the IRS subjected their applications to heightened scrutiny and unnecessary delays due to their political viewpoints. This case was supported by findings from the Treasury Inspector General for Tax Administration (TIGTA) and various Senate committees, which confirmed that the IRS discriminated against dissenting groups based on their political viewpoints . *NorCal Tea Party Patriots v. IRS, 2022 U.S. Dist. LEXIS 80117.* In "True the Vote, Inc. v. IRS," the D.C. Circuit Court of Appeals reversed a district court's dismissal of claims that the IRS targeted applications based on political viewpoints, recognizing that the plaintiffs' claims were not moot despite the IRS's cessation of the discriminatory practices. *True the Vote, Inc. v. IRS, 831 F.3d 551.* The case "Zherka v. Ryan" involved a plaintiff who claimed that IRS

employees hindered his application for tax-exempt status and initiated an investigation against him as part of a broader effort to penalize Tea Party members for their political activities. The court allowed the case to proceed against certain defendants, acknowledging the allegations of political discrimination. *Zherka v. Ryan, 52 F. Supp. 3d 571*. Additionally, "Teague v. Alexander" from the D.C. Circuit Court of Appeals discussed the implications of the IRS focusing its investigative resources on political dissidents, highlighting the potential chilling effect on political expression and the need for a compelling interest to justify such actions. *Teague v. Alexander, 662 F.2d 79.*

a. These cases collectively support the Plaintiff's argument that the IRS has at times targeted individuals and entities based on their political speech, which can be used to substantiate claims of discrimination due to political viewpoints. The J5/IRS investigation of the bank in the first place seemed inspired, in part, by the belief that someone who criticizes the laws must have broken them. Also, Plaintiff's father was a well-known tax protestor who did prison time and IRS/J5 might have been triggered by the connection.

   i. This was corroborated by the fact that the sole defense offered by the respondents (some also named in this complaint) in his winning defamation lawsuit in Australia were Mr. Schiff's public criticisms of the IRS, income taxes, and AML laws. Plaintiff believes that the IRS and/or other J5 representatives may have helped respondents prepare that defense.

3. There is also case law supporting the allegation that the IRS has targeted individuals and entities known for their public criticism of the IRS, income tax, and AML laws, which can be used to support a plaintiff's claim of discrimination due to political speech. In "Linchpins of Liberty v. United States," the plaintiffs alleged that the IRS intentionally and systematically targeted conservative organizations applying for tax-exemption, subjecting them to additional and unconstitutional scrutiny based on their political views. This included significantly delaying the processing of applications and making unnecessary and irrelevant requests for additional information. *Linchpins of Liberty v. United States, 71 F. Supp. 3d 236.* This case does illustrate allegations of viewpoint-based targeting by the IRS, which could potentially support the allegation of discrimination based on

political speech. Similarly, in "True the Vote, Inc. v. IRS," supra, the plaintiff claimed that the IRS targeted their application for tax-exempt status due to their mission of promoting election integrity and perceived association with Tea Party organizations. The IRS admitted to using inappropriate criteria to identify applications for review based on organizational names and policy positions, leading to unwarranted delays and burdensome information requests. In 2017, the IRS agreed to settle the case True the Vote, Inc. v. IRS, 71 F. Supp. 3d 219. Also, in "*NorCal Tea Party Patriots v. IRS*," supra, plaintiffs alleged that the IRS targeted their tax-exemption applications because their names included terms like "Tea Party" or "Patriots," or because they focused on issues such as government spending. The IRS subjected these applications to heightened scrutiny and unnecessary delays, which was also the subject of investigations by the Treasury Inspector General for Tax Administration and Senate committees *NorCal Tea Party Patriots v. IRS, 2016 U.S. Dist. LEXIS 5889, NorCal Tea Party Patriots v. IRS, 2022 U.S. Dist. LEXIS 80117*. Additionally, in "Allen v. United States," plaintiffs alleged that the IRS and DOJ conducted raids and other aggressive actions as part of a policy to retaliate against organizations advocating for the abolition of the income tax and the reduction of IRS powers. This included the allegations of constitutional violations stemming from these actions. *Allen v. United States, 2004 U.S. Dist. LEXIS 33236, Allen v. Damm, 2011 U.S. Dist. LEXIS 100259*.

   a. These last cases collectively illustrate a pattern where the IRS has been accused of targeting individuals and entities based on their political speech and criticism of tax laws, which support the plaintiff's allegation of discrimination due to political speech.

4. A successful claim would require demonstration that: The plaintiff was engaged in constitutionally protected activity such first amendment protected speech by criticizing the IRS, the income tax in general, and AML laws in particular that he feels are violating individual privacy. The defendant's actions (IRS failed investigation and enforcement actions in collusion with OCIF to close the bank plus the press conference that damaged Plaintiff personal and professional reputation) would chill a person of ordinary firmness from continuing to engage in that activity. There was a causal connection between the protected activity and the defendant's adverse actions and that the alleged conspiracy was motivated, in part, by this discriminatory intent, among others. In the

Australia defamation lawsuit that Plaintiff won against Nine, their entire defense, was Plaintiff' political statements. They said it was Plaintiff's dislike of taxes and regulations that proved he was using the bank to help customers break the laws Plaintiff did not agree with in the first place.

5. As for religion discrimination from IRS part, in *United States v. Z Street (2015);* Z Street, a non-profit corporation pro-Israel group, dedicated to educating the public about various issues related to Israel and the Middle East claimed that the IRS delayed and scrutinized its application for tax-exempt status due to its pro-Israel stance, which the group argued was religious and political discrimination. Z Street sued the IRS under the First Amendment, arguing that it was targeted based on its religious and political views. The case was settled in 2018, with the IRS agreeing to cease discriminatory practices. The settlement agreement includes an apology from the IRS to Z Street for the delayed processing of the group's application for tax-exempt status.

   a. Plaintiff is a member of a protected class by reason of race & religion, and as per Section 1985(3) addressing conspiracies that deprive individuals of equal protection or equal privileges under the law. This case supports Plaintiff claims that he is part of a protected class, and that the alleged conspiracy was motivated, in part, by this discriminatory intent.

6) Count IV (In the alternative, of Claim III): Violation of Civil Rights -Due Process and Unlawful Seizure of Property (Fifth Amendment)

   a) The defendants unlawfully deprived the Plaintiff of property without due process, violating the Fifth Amendment. Under Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971), federal agents can be held accountable for constitutional violations.

   b) Plaintiff's claim of alleged conspiracy involving the Chief of Crime Division of the IRS, several of his agents, the J5 (Joint Chiefs of Global Tax Enforcement), the Puerto Rico Commissioner of Financial Institutions, and its Trustee, have *an independent cause of action* under *Bivens* and its progeny (*Carlson v. Green* and *Davis v. Passman*), despite the limitations imposed by *Ziglar v. Abbasi*.

   c) Constitutional Violation:

      i) A *Bivens* action arises when federal officers violate a person's constitutional rights. In this case, the alleged conspiracy involves a deprivation of constitutional rights—due process (5th Amendment), and equal protection (14th Amendment as applied through

the fifth), since the IRS, through Mr. Lee arbitrary and capricious actions deprived Plaintiff of his property without due process.

    ii)  Historical Precedents and *Bivens'* Core Scope:

        (1) The original *Bivens* case, which allowed a remedy for constitutional violations by federal agents under the 4th Amendment, has been extended in some cases. *Carlson v. Green* allowed *Bivens* suits for 8th Amendment violations, and *Davis v. Passman* permitted *Bivens* remedies under the 5th Amendment's equal protection guarantee. Even though *Ziglar v. Abbasi* imposed limits on expanding *Bivens* actions, it left the door open for claims that arise within the core contexts recognized by the courts—especially 4th and 5th Amendment violations. The facts surrounding the alleged conspiracy involve these types of violations, supporting the idea that *Bivens* is still applicable.

d)  Special Factors and *Ziglar's* Limits:

    i)  While *Ziglar* cautions against extending *Bivens* remedies into new contexts, it also acknowledges that such remedies are still appropriate where there is no alternative remedy available and where "special factors" do not counsel against allowing the claim. In this case:

    ii)  **Lack of alternative remedies**: If there is no other effective remedy for the Plaintiffs (e.g., statutory remedies like the Federal Tort Claims Act (FTCA) or other legal recourses under Puerto Rico law are inadequate and unavailable), a court could recognize the need for a *Bivens* remedy. This lack of alternatives could weigh heavily in favor of allowing our claim to proceed.

    iii)  **Nature of the federal action**: The court may consider whether the conduct alleged (an alleged conspiracy to deprive rights) involves government overreach and misconduct that *Bivens* was designed to address. In *Ziglar*, the Court considered national security concerns as a "special factor" counseling against a remedy, but in this case, unless the defendants raise national security issues, this factor may not apply.

e)  Alleged conspiracy and Individual Liability:

    i)  As the alleged conspiracy involves high-level federal officials (like the Chief of the Criminal Division of the IRS and J5 officials) alongside Puerto Rican officials, it strengthens our argument for a *Bivens* claim. The involvement of multiple federal and state actors in a concerted effort to violate constitutional rights could make the situation more egregious, as it shows deliberate and complex coordinated action to deprive individuals of their rights.

    ii)  In *Ziglar*, the Court was hesitant to extend *Bivens* to new contexts partly because of the nature of policymaking and broad governmental interests. However, in the case of

individual actors conspiring to violate specific constitutional rights (such as due process), the nature of the action is more personal, deliberate, and fits the traditional application of *Bivens*.

f) Accountability and Deterrence:

   i) The core purpose of *Bivens* actions is to hold federal officials personally accountable for violations of constitutional rights, providing a deterrent against future misconduct. Allowing this claim to proceed in this case could serve this purpose, ensuring that federal officials cannot act with impunity in concert with other government entities to violate citizens' rights. This argument aligns with the underlying rationale of *Bivens* as a tool for checking abuse of power.

g) Role of Puerto Rican Officials and Federal Overreach:

   i) The involvement of Puerto Rican officials (like the Commissioner of Financial Institutions and its Trustee) adds an additional layer to our alleged conspiracy claim. Puerto Rico's unique constitutional status as a U.S. territory, where both local and federal laws apply, could provide a compelling argument that federal overreach needs to be checked, especially if local officials are complicit in an alleged conspiracy orchestrated by federal agencies.

h) Conclusion:

   i) While *Ziglar v. Abbasi* has curtailed the expansion of *Bivens* remedies, there is still room for claims involving core constitutional violations, particularly those arising under the 4th and 5th Amendments. If, as Plaintiff believes, the alleged conspiracy involves such violations and there are no adequate alternative remedies, the courts should allow a *Bivens* claim to proceed, especially if individual federal officers are personally responsible for unconstitutional conduct. Given the alleged participation of high-level federal and local officials in a coordinated alleged conspiracy, this case may present the type of "egregious" conduct that courts have historically been willing to address through *Bivens* actions.

7) Damages Calculation

   a) Compensatory Damages:

   b) Loss of the $17.5 million bank sale that when adjusted for inflation amounts to about $18.8 million to $25 million.

   c) Reputational damage and lost opportunities are estimated at $10 million.

   d) Wrongful compliance penalties and fines total $300,000.

   e) Punitive Damages:

f) Due to the malicious nature of the defendants' actions, $20 million in punitive damages is sought.

g) Total Damages: Between $49.8 million and $56 million, plus reasonable interest, court procedure costs and attorney's fees.

8) Prayer for Relief

a) The Plaintiff seeks compensatory and punitive damages totaling between $49.8 million and $56 million, along with interests accrued since the filing of this request at the legal interests prevailing in Puerto Rico, court procedure costs, attorney's fees, and any other relief deemed just.

   i) **Corruption and Abuse of Power:** Plaintiff believes the actions of the defendants constitute an egregious example of abuse of power and a betrayal of public trust. If proved, then they engaged in coordinated maneuvers to obstruct justice, undermine due process protections, and subverting the principles foundational to our legal system. The Supreme Court has held that the abuse of governmental power to deprive individuals of their rights is inherently offensive to due process (see *Daniels v. Williams*, 474 U.S. 327 (1986) "the Due Process Clause was intended to prevent governmental power from being used for purposes of oppression and that mere negligence does not meet this threshold"; *Rochin v. California*, 342 U.S. 165 (1952) "The Court established that conduct which "shocks the conscience" is necessary to implicate substantive due process protections under the Fourteenth Amendment"). Such conduct defies the core principles of accountability and tarnishes the integrity of institutions meant to safeguard citizens' rights, requiring the court's firm intervention." It is important to note that mere negligence does not meet this threshold. The Plaintiff's assertion that the defendants' actions, if proved, constitute an abuse of power and a betrayal of public trust aligns with the Supreme Court's interpretation of due process protections, provided that the conduct in question is proved, as the Plaintiff intends to do, to be sufficiently egregious to "shock the conscience.

   ii) **Public Accountability:** This court must reaffirm that government officials, irrespective of rank, are bound by law. Plaintiff believes that allowing these actions to proceed unchecked would invite further abuses, eroding public trust and confidence. As articulated in *Butz v. Economou*, 438 U.S. 478 (1978), 'federal officials, though entitled to immunity, are subject to the constraints of the law,' underscoring that they must be held accountable when acting beyond legal bounds. Here, the defendants' actions reflect a contemptuous disregard for public duty and legal standards, necessitating judicial oversight to uphold the integrity of our legal system." Specifically, the Court in

*Davis v. Passman, 442 U.S. 228*. stated that "no man in this country is so high that he is above the law" and that "no officer of the law may set that law at defiance with impunity," and that " It is not unfair to hold liable an official who knows or should know they are acting outside the law, and that insisting on an awareness of clearly established constitutional limits will not unduly interfere with the exercise of official judgment".

iii) **Protection from Rogue Officials:** If proved, these actions extend beyond harm to the Plaintiff; they represent a clear threat to public security and the rule of law. In *Owen v. City of Independence*, 445 U.S. 622 (1980), the Supreme Court recognized that citizens have the right to protection from wrongful conduct by government officials. The Court held in Owen that municipalities are not entitled to qualified immunity from liability under § 1983, thereby affirming that citizens can seek redress for constitutional violations caused by municipal policies or customs. Similarly, in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Court emphasized that officials are accountable for actions that violate established rights. The Supreme Court emphasized that government officials are accountable for actions that violate established constitutional rights. The Court held that "government officials performing discretionary functions are generally shielded from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. This standard aims to ensure that officials are aware of and adhere to clearly established legal norms, thereby holding them accountable for violations of such rights, this court's intervention is crucial to prevent such misconduct from becoming commonplace, ensuring the public's protection from officials who exploit their authority."

iv) **Precedent and Deterrence:** Finally, Plaintiff also believes that failure to hold defendants' accountable risks establishing a precedent that allows abuse of power to persist without consequence. In *Hope v. Pelzer*, 536 U.S. 730 (2002), the Court stressed that officials must be held liable when they flagrantly violate constitutional rights, as such rulings serve to deter similar future misconduct. Here, judicial intervention is essential to send a clear message that this behavior will not be tolerated, thereby protecting public trust in the law and deterring future abuses of power." The Supreme Court highlighted that qualified immunity does not protect officials when they are on notice that their conduct is unlawful, even in novel factual situations. The Court rejected the requirement that previous cases be "fundamentally similar" and stressed that "the salient question is whether the state of the law at the time gave the officials fair warning that their conduct was unconstitutional. This ruling serves to deter future misconduct and protect public trust in the law by ensuring that officials are aware of

the boundaries of lawful conduct and are held accountable when they overstep these boundaries."

9) Jury Request
   a) The Plaintiff requests a trial by jury on all issues so triable.

10) Legal Citations:

**Legal Cases**

1. Allen v. United States, 2004 U.S. Dist. LEXIS 33236

2. Am. Crystal Sugar Co. v. County of Polk, 2009 Minn. Tax LEXIS 16

3. Anchor Sav. Bank, FSB v. United States, 81 Fed. Cl.

4. Ashcroft v. Iqbal, 556 U.S. 662

5. Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)

6. Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971)

7. Butz v. Economou, 438 U.S. 478 (1978)

8. Calder v. Jones, 465 U.S. 783 (1984)

9. Carmen González v. Hosp. San Francisco, 2001 PR App. LEXIS 418

10. Castellar v. McAleenan, 388 F. Supp. 3d 1218

11. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)

12. Colon Prieto v. Geigel, 115 D.P.R. 232

13. County of Sacramento v. Lewis, 523 U.S. 833 (1998)

14. Credit Acceptance Corp. v. Pinkney, 80 Misc. 3d 1093

15. Cullifer v. Comm'r, T.C. Memo 2014-208

16. Daniels v. Williams, 474 U.S. 327 (1986)

17. Davis v. Passman, 442 U.S. 228

18. De Seguros De v. Blanco, 2020 PR App. LEXIS 2465

19. Demars v. General Dynamics Corp., 779 F.2d 95

20. Emerito Estrada Rivera-Isuzu De P.R., Inc. v. Consumers Union of United States, Inc., 233 F.3d 24

21. Fed. Educ. Ass'n - Stateside Region v. DOD, 841 F.3d 1362

22. Flores-Demarchi v. Smith, 2022 Tex. App. LEXIS 4489

23. Fundient, LLC v. Johnson Controls, Inc., 2023 U.S. Dist. LEXIS 54812

24. Greene v. Union Mut. Life Ins. Co., 764 F.2d 19

25. Harlow v. Fitzgerald, 457 U.S. 800 (1982)

26. Heffernan v. City of Paterson, 578 U.S. 266

27. Hope v. Pelzer, 536 U.S. 730 (2002)

28. In re Royal Ahold N.V. Sec. & ERISA Litig., 351 F. Supp. 2d 334

29. José Llanos Bultrón v. Universidad De P.R., 2008 PR App. LEXIS 2967

30. Kaveh Afrasiabi v. UPI, 561 F. Supp. 3d 1

31. KMG Kanal-Muller-Gruppe Deutschland GMBH, & Co. KG v. Davis, 175 S.W.3d 379

32. Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982)

33. Marrero-Rodríguez v. Municipality of San Juan, 677 F.3d 497

34. Mastercraft Floor Covering, Inc. v. Charlotte Flooring, Inc., 2013 OK 87

35. Mathews v. Eldridge, 424 U.S. 319 (1976)

36. New Eng. College v. Drew Univ., 2009 DNH 16

37. Noonan v. Winston Co., 135 F.3d 85

38. NorCal Tea Party Patriots v. IRS, 2022 U.S. Dist. LEXIS 80117

39. Ojeda Ojeda v. El Vocero, Inc., 137 D.P.R. 315

40. Owen v. City of Independence, 445 U.S. 622 (1980)

41. Peter Schiff vs. Nine Network Australia, Australian Trial Court (2022)

42. Pelt v. Amell, 2023 Tex. Dist. LEXIS 4331

43. Piccone v. Bartels, 2012 U.S. Dist. LEXIS 141817

44. Plixer Int'l, Inc. v. Scrutinizer GmbH, 293 F. Supp. 3d 232

45. Richards v. Mileski, 662 F.2d 65

46. Rochin v. California, 342 U.S. 165 (1952)

47. S.C. v. New Jersey Dept. of Children & Families, 242 N.J. 201

48. Sandler v. Calcagni, 565 F. Supp. 2d 184

49. Shockley v. Comm'r, T.C. Memo 2015-113; 872 F.3d 1235

50. Sisk v. Elevate Indep. Servs., 2016 Cal. Super. LEXIS 4808

51. State v. Conn. State Univ. Org. of Admin. Fac., 349 Conn. 148

52. Tenneco Inc. v. Enterprise Prods. Co., 925 S.W.2d 640

53. Teague v. Alexander, 662 F.2d 79

54. True the Vote, Inc. v. IRS, 831 F.3d 551

55. Truck Drivers & Helpers Union, Local No. 170 v. NLRB, 993 F.2d 990

56. Velto v. Draeger Med., Inc., 2009 U.S. Dist. LEXIS 57088

57. Walden v. Fiore, 571 U.S. 277

58. Williams v Citigroup, Inc., 104 A.D.3d 521

59. Yohe v. Nugent, 321 F.3d 35

60. Zherka v. Ryan, 52 F. Supp. 3d 571

61. Zinermon v. Burch, 494 U.S. 113 (1990)

**Laws and Statutes**

1. 5 U.S.C. § 706 – Scope of Review

2. 28 U.S.C. § 1331 – Federal Question Jurisdiction

3. 28 U.S.C. § 1332 – Diversity Jurisdiction

4. 28 U.S.C. § 1391 – Venue

5. 33 L.P.R.A. § 5003 – Scope of Application of the Criminal Law

6. 33 L.P.R.A. § 5132 – Statute of Limitations

7. 33 L.P.R.A. § 5334 – Conspiracy

8. 42 U.S.C. § 1983 – Civil Action for Deprivation of Rights

9.  42 U.S.C. § 1985(3) – Conspiracy to Interfere with Civil Rights

10. Bivens Action – Based on Bivens v. Six Unknown Named Agents

11. FAS 72 – Accounting Standards for Certain Banking Acquisitions


Attorney for the Plaintiff:

_____

Ismael Torres-Pizarro. PhD, PE, Esq.
USDC (Bar Number) 231302
Attorney for the Plaintiff
Domingo Cruz 642 Villa Prades, San Juan PR 00924
Telephone: (787)315-5636
Email: Ismaeltorres2002@yahoo.com