IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| PETER DAVID SCHIFF<br><br>Plaintiff,<br><br>v.<br><br>INTERNAL REVENUE SERVICE (IRS) et al.,<br><br>Defendants, | CIVIL NO. 24-01511<br><br><br><br>TRIAL BY JURY DEMANDED |

**RESPONSE DEFENDANTS' MR. YORK & HMRC'S MOTION TO DISMISS (ECF No. 139)**

COMES NOW, Plaintiff Peter D. Schiff, by and through undersigned counsel, and respectfully files this opposition to Defendant Mr. **Simon York's** motion to dismiss the Amended Complaint under Rules 12(b)(1), 12(b)(5), and 12(b)(6). Mr. York—former Director of HM Revenue & Customs' Fraud Investigation Service and the United Kingdom's delegate to the Joint Chiefs of Global Tax Enforcement ("J5")—asks this Court to cloak him in Foreign Sovereign Immunities Act and common-law foreign-official immunity and to fault the pleadings and service. Yet the operative allegations, reinforced by newly disclosed FOIA e-mails, show that Mr. York acted in his personal capacity, collaborating with IRS-CI Chief Mr. Jim Lee, the Puerto Rico's Office of the Commissioner of Financial Institutions ("OCIF"), and the other defendants to derail a $17.5 million stock sale of Euro Pacific Bank, push the bank into receivership, and headline a 30 June 2022 press conference that falsely branded the institution and its owner as money-launderers. These coordinated, commercially motivated acts fall squarely outside any statutory or common-law immunity and inflicted concrete injury in this forum.

**PLAINTIFF'S OPPOSITION TO THE "INTRODUCTION"**

Plaintiff respectfully moves the Court to deny the relief requested in Mr. Simon York and HMRC's Motion to Dismiss ("MTD") and states:

**I. Service of Process Was Timely and Valid**

1

    a. **Hague–compliant mail.** The United Kingdom has **not objected** to service by postal or personal channels under Article 10(a) of the Hague Service Convention. Service by certified international mail and or personal therefore satisfies Fed. R. Civ. P. 4(f)(1) and *Water Splash, Inc. v. Menon, 581 U.S. 271, 137 S. Ct. 1504, 197 L. Ed. 2d 826, 2017 U.S. LEXIS 3212.*

    b. **Alternate means independently authorized.** Even if Article 10 were unavailable, Rule 4(f)(3) gives the Court discretion to approve any method "not prohibited by international agreement," without requiring exhaustion of Hague channels. Mr. York had actual notice and suffered no prejudice; due process is satisfied. (The First Circuit treats Rule 4(f)(3) orders as routine when Hague formalities impose needless delay.)

**II. FSIA Does Not Bar this Action.**

1. **FSIA inapplicable to individuals.** The MTD's sovereign-immunity thesis collapses at step one: the FSIA covers "foreign states," not natural persons. *Samantar v. Yousuf, 560 U.S. 305, 324 (2010).*

2. **Statutory exceptions would apply in any event.** HMRC acted as a co-conspirator in blocking a private bank sale and orchestrating a press event; that is textbook **"commercial activity"** under 28 U.S.C. § 1605(a)(2). The First Circuit recently held that comparable employer-type conduct by a foreign government is commercial, not sovereign. *Merlini v. Canada, 926 F.3d 21, 29-33 (1st Cir. 2019).* Likewise, the **non-commercial-tort exception** (§ 1605(a)(5)) removes immunity because the in-forum press conference and resulting defamation constitute tortious acts "occurring in the United States."

3. **Universal Trading confirms jurisdiction.** Where (as here) a foreign entity enters transactions having "direct economic effect" in the forum, the United States District Court for the District of Massachusetts found FSIA immunity waived. *Universal Trading & Inv. Co. v. Bureau for Representing Ukrainian Interests in Int'l & Foreign Courts, 898 F. Supp. 2d 301, 2012 U.S. Dist. LEXIS 133736, 2012 WL 4324062.*

**III. Common-Law Foreign-Official Immunity Does Not Shield Mr. York**

1. **No automatic immunity after Samantar v. Yousuf, 560 U.S. 305, 324 (2010).** Whether an individual official enjoys common-law immunity depends on the nature of the act. Conspiring with U.S. regulators to shut a

2

private bank for publicity and leaking false allegations to the press are not "quintessentially sovereign" functions; they are ultra vires torts. Mr. York therefore enjoys no status-based protection.

2. **Allegations plead non-sovereign, bad-faith conduct.** FOIA emails show HMRC praised IRS negotiations with OCIF to produce a media "outcome," confirming the acts were political theatre, not lawful enforcement.

### IV. This Court Possesses Personal Jurisdiction

1. **Purposeful targeting of Puerto Rico.** Mr. York knowingly participated (at least virtually) in the San Juan press conference, directing reputational harm at a Puerto Rico resident and bank. The First Circuit upholds jurisdiction where foreign actors intentionally aim defamatory conduct at the forum., *Adelson v. Hananel, 510 F.3d 43, 2007 U.S. App. LEXIS 28033, 26 I.E.R. Cas. (BNA) 1689, (1st Cir. 2011); Calder v. Jones, 465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804, 1984 U.S. LEXIS 41, 52 U.S.L.W. 4349, 10 Media L. Rep. 1401, (1984).*

2. Immediately following his virtual appearance at the press conference, York recorded a 90-second video which he distributed publicly, including on his personal LinkedIn account, where he not only knowingly falsely accused the bank of helping hundreds of individuals in the UK to evade taxes and launder money, but specifically took credit for the de-registration of Euro Pacifc Bank as being a "landmark moment in the HMRC's response to offshore tax evasion." He ended the video by stating that the action against Euro Pacific Bank "sends a clear message that HMRC will take action against financial institutions that help individuals and corporations evade taxes."  This video not only repeated the defamatory comments made during the press conference, but included an admission that the statement made during the press conference that OCIF acted independently was a lie, as York admitted the OCIF decision was the result of specific actions he took on behalf of the HMRC.  It is also important to note that over the past three years, not a single one of the hundreds of individuals York claimed were using Euro Pacific Bank to evade taxes has been charged with tax evasion, let alone convicted.

3. in June 2022 some people were still reluctant to travel due to COVID.  So that may be one reason the other J5 Chiefs chose to appear virtually. But that should not let them off the hook from being present for the purposes of liability for the roles they played in the conspiracy, or the damages they helped to cause.

3

4. **Conspiracy contacts are attributable.** HMRC's and Mr. York's coordinated action with IRS and OCIF within Puerto Rico tie them to the forum; a single overt act in furtherance of a conspiracy suffices under First Circuit precedent.

**V. The Amended Complaint States Plausible Claims**

1. The pleadings detail a **multi-agency scheme**: OCIF blocked a $17.5 million stock sale, forced a $1.25 million asset liquidation, and staged a press event implying money-laundering—all at HMRC/J5 urging. These facts, drawn from the Amended Complaints (Docs 121 & 3), easily satisfy Rules 8(a) and 9(b) for civil-rights, Bivens, defamation and tortious-interference counts.

**CONCLUSION TO THE "INTRODUCTION"**

Mr. York and HMRC seek dismissal on grounds already rejected by binding First-Circuit and Supreme-Court authority. Service was proper, immunity is unavailable, and this Court has both personal and subject-matter jurisdiction. The Motion to Dismiss should therefore be **DENIED**.

**PLAINTIFF'S COUNTER-STATEMENT OF FACTS IN OPPOSITION**

Plaintiff submits this concise counterstatement, showing why the scant six "facts" recited in § II of Defendants' brief are incomplete, misleading, or contradicted by the pleadings and documentary evidence. As the First Circuit instructs, on a Rule 12 motion the Court must **credit plaintiff's well-pleaded facts and draw all reasonable inferences in his favor** — not Defendants' self-serving gloss. *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 2011 U.S. App. LEXIS 6763 (1st Cir. 2011); *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 2013 U.S. App. LEXIS 5803, 97 Empl. Prac. Dec. (CCH) P44,858, 2013 WL 1173679, (1st Cir. 2011).

**1. Citizenship Is Undisputed but Legally Irrelevant**

Defendants note that Mr. Schiff is a U.S. citizen residing in Puerto Rico. That uncontested fact supports venue and personal injury "effects" in this forum; it does nothing to advance dismissal. *Calder v. Jones*, 465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804, 1984 U.S. LEXIS 41, 52 U.S.L.W. 4349, 10 Media L. Rep. 1401 (1984) (targeting a plaintiff in the forum is jurisdictionally consequential).

**2. "Operation Atlantis" Was a Public-Relations Stunt, Not Legitimate Enforcement**

Mr. York/HMRC paint the J5 investigation as routine regulation. FOIA emails tell another story: a **July 1, 2022, congratulatory note from Australian Deputy Commissioner Mr. Will Day to IRS Chief Mr. Jim Lee** thanks Mr. Lee for "*negotiating today's outcome with OCIF*," proving the closure was choreographed, not autonomous.

- Euro Pacific Int, Bank (EPIB) was **cash-solvent** and 100 %-reserve; OCIF's own August 9, 2022, order admits customer deposits were fully covered.

- Plaintiff stood ready to inject an additional $7 million in capital, which OCIF rejected because a shutdown—not remediation—served J5's media agenda.

Accordingly, the "investigation" Defendants trumpet is itself a contested fact, not an accepted premise.

**3. Mr. York and HMRC Did Far More Than "Participate" Abstractly**

Defendants downplay their own conduct. The pleadings allege (and documentary exhibits corroborate) that:

- Mr. York and fellow J5 chiefs **planned the Puerto Rico press conference months in advance**, selecting June 30, 2022, to mark J5's fourth anniversary.

- Mr. York (though then a senior HMRC official) **appeared virtually on the dais**, tacitly endorsing IRS Chief Mr. Lee's defamatory narrative that EPIB was "a money-laundering bank" – a message immediately echoed worldwide by The New Times and The Age.

- The same J5 group induced OCIF to **block a $17.5 million stock sale** to Qenta and later forced a receivership fire-sale for $1.25 million, inflicting direct economic loss on Plaintiff.

Under Calder's "effects test," such purposeful forum-directed acts suffice for personal jurisdiction and pierce any cloak of sovereign-function rhetoric.

**4. Media-Amplified Defamation and Business Interference Are Core Allegations**

Mr. York/HMRC omit that the Amended Complaints charge them with conspiring to leak grand-jury secrets to favored reporters, who then published sensational stories later adjudged false by an Australian court. The press-conference theatrics magnified those lies, causing:

- Freeze of hundreds-of-millions in correspondent accounts (Novo Bank, Portugal).

- Permanent reputational injury and lost investor confidence, an element of damages both for § 1985(3) conspiracy and tortious interference counts.

These are not speculative harms; they are pleaded with particularity and supported by documents.

### 5. Ongoing Receivership Losses Confirm Present, Forum-Based Injury

Contrary to Defendants' suggestion of closed-ended harm, the custodial liquidation they engineered **has still not returned customer funds after three years**, consuming what would have been $ 2 million in residual equity and even likely precipitating at least one depositor's suicide that the Plaintiff is aware. This continuing injury squarely rebuts mootness and underscores Puerto Rico's interest in adjudicating the controversy.

### 6. Service Facts Are Hotly Contested and Irrelevant to the Merits

The final two "facts" merely restate Defendants' service-of-process arguments. Even if factual, they bear on Rule 12(b)(5), not the substance of Plaintiff's claims; they therefore belong in the argument section, not a purportedly neutral statement of facts.

**CONCLUSION TO STATEMENT OF FACTS**

Section II of the Mr. York/HMRC brief omits critical context, cherry-picks allegations, and ignores documentary admissions showing deliberate, concerted misconduct aimed at Plaintiff. The Court must accept the fuller narrative set forth above and in the Amended Complaints. Under the binding First-Circuit precedent, these facts, taken as true, easily sustain personal jurisdiction and every pleaded cause of action.

**PLAINTIFF'S CONSOLIDATED OPPOSITION TO § III**

Plaintiff submits this concise memorandum rebutting each dismissal ground asserted in § III of the Mr. York/HMRC brief.

**I. Service of Process Was Lawful and Sufficient (Fed. R. Civ. P. 4)**

1. **Hague Article 10(a) permits mail to the U.K personal and hand-delivery is covered by Article 10(b) and (c) ("directly through … judicial officers, officials or other competent persons").** The United Kingdom has lodged no objection to any part of Article 10. The United Kingdom never objected to postal or personal service under the Hague Convention; certified Royal Mail or personal delivery therefore satisfies Rule 4(f)(1) and 28 U.S.C. § 1608(a)(2). The Supreme Court confirmed that Article 10 authorizes service like postal or personal. *Water Splash, Inc. v. Menon, 581 U.S. 271, 137 S. Ct. 1504, 197 L. Ed. 2d 826, 2017 U.S. LEXIS 3212, 85 U.S.L.W. 4252, 41 I.E.R. Cas. (BNA) 1816, 26 Fla. L. Weekly Fed. S 577, 2017 WL 2216933 (2017).*

    Service of Process Was Lawful and Sufficient (Fed. R. Civ. P. 4) Article 10(a) of the Hague Service Convention authorizes service "by postal channels," and the United Kingdom has never objected to that method; certified or registered Royal Mail therefore complies with Rule 4(f)(1) and 28 U.S.C. § 1608(a)(2). Separate and independent, Articles 10(b) and 10(c) permit direct personal service through "competent persons," a channel the U.K. likewise accepts—so hand-delivery in London is equally valid. The Supreme Court confirmed in *Water Splash, Inc. v. Menon, 581 U.S. 271, 281-82 (2017),* that Article 10 authorizes service by mail (and, by extension, other unobjected-to Article 10 methods) whenever the destination state acquiesces and the forum's rules otherwise permit.

2. **Rule 4(f)(3) offers an independent path.** Even if Article 10 were somehow unavailable, this Court may approve any method "not prohibited by international agreement." Numerous First-Circuit district courts have ordered Rule 4(f)(3) service where Hague mechanics would impose needless delay, so long as the defendant receives actual notice. Mr. York and HMRC indisputably had notice within days of filing.

    The Plaintiff defeat the Rule 12(b)(5) challenge by showing that the summons and complaint were hand-delivered in London on 2 May 2025 and thus, satisfies both Federal Rule 4 and the Hague Service Convention— and that no further steps were required under U.K. or U.S. law.

7

First, Rule 4(f)(1) authorizes service abroad "by any internationally agreed means … such as those authorized by the Hague Convention." The Convention's own text confirms that personal delivery is one of those means. Article 5 expressly provides that a document "may always be served by delivery to an addressee who accepts it voluntarily," while Articles 10(b) and 10(c) add that the treaty "shall not interfere with the freedom to effect service … directly through the … competent persons of the State of destination." **The receptionist at HMRC's 100 Parliament Street headquarters did exactly that, accepting the papers without coercion and thereby perfecting service**.

Second, the United Kingdom has never filed a reservation objecting to personal service under Articles 10(b)-(c); its declaration states that personal service is an acceptable method whenever feasible. Because the forum State of destination has voiced no objection, Article 10 remains fully available, and the Hague Convention imposes no obligation to route papers through the U.K. Central Authority.

Third, binding and persuasive precedent within the First Circuit treats Article 10 service as valid whenever the destination State does not object. In *Ramirez de Arellano v. Colloides Naturels Int'l, 236 F.R.D. 83.,* the Federal District of Puerto Rico upheld service in France accomplished under Article 10 and noted that the Hague "permits alternate channels so long as the receiving country acquiesces." 236 F.R.D. 83, 87 (D.P.R. 2006). More recently, *Granger v. Nesbitt, 2021 U.S. Dist. LEXIS 193800* reiterated that Article 10 methods—including personal delivery—are proper in a Hague country that has not opted out, a view echoed in *Angiodynamics, Inc. v. Clarion Med. Techs., 2019 U.S. Dist. LEXIS 233819, 2019 WL 10787926.*

Fourth, the Supreme Court's decision in *Water Splash, Inc. v. Menon, 581 U.S. 271 (2017),* removes any doubt: the Convention "permits, but does not require" use of a Central Authority, and service by other Article 10 channels is effective unless the destination State objects.

Fifth, even if there were an arguable technical defect, courts in this circuit routinely deny dismissal where **the defendant has actual notice and cannot show prejudice**. <u>Mr. York's own declaration</u> concedes <u>prompt awareness</u> of the lawsuit, confirming that <u>the underlying due-process purpose of service was fulfilled</u>. Granger

illustrates the point: the court chose to quash and re-serve rather than dismiss once it was clear the defendants already knew of the action.

Finally, service on HMRC as an agency of a foreign state is likewise sound under 28 U.S.C. § 1608(a)(2). That subsection allows "any method prescribed by an applicable international convention" and does not compel a plaintiff to follow the internal routing rules of the Crown Proceedings Act when a Hague-approved alternative— here, voluntary personal delivery—is used. The statute's hierarchy is satisfied once the Convention itself is respected.

In sum, (1) the Hague Convention text authorizes voluntary hand-delivery; (2) the United Kingdom affirmatively permits it; (3) First-Circuit and District-of-Puerto-Rico precedent accept Article 10 service as valid; (4) the Supreme Court has blessed non-Central-Authority channels; and (5) defendants received timely, actual notice, eliminating any claim of prejudice. Together, these points demonstrate that service in this case "was done right", and the Rule 12(b)(5) motion should therefore be denied.

3. **Technical objections are immaterial after actual notice.** When a foreign defendant concedes actual receipt, dismissal is disfavored absent prejudice. Mr. York's own declaration (ECF 139-1) admits awareness of the summons—negating any due-process concern.

The Plaintiff respectfully submits that the hand-delivered summons and complaint effected in London on 2 May 2025 fully complies with both the Hague Service Convention of 15 November 1965 and Federal Rule of Civil Procedure 4. The Convention's text confirms that personal service is permissible. Article 5, after describing two methods a Central Authority may employ, states that "the document may always be served by delivery to an addressee who accepts it voluntarily." This clause provides an independent, self-executing basis for hand-delivery whenever the recipient accepts the papers without coercion, as occurred here when a designated HMRC employee received the packet.

Articles 10(b) and 10(c) reinforce the point by declaring that, so long as the State of destination has not objected, the Convention "shall not interfere" with the freedom to serve judicial documents "directly through the judicial officers, officials or other competent persons of the State of destination." The United Kingdom, the

destination state in this case, has never entered a blanket objection to Article 10. Its declaration merely states that requests for service "through official channels" must pass through the Central Authority; it does not restrict parties from engaging a competent local person—such as a solicitor or licensed process server—to complete personal service. Indeed, the U.K. Foreign, Commonwealth & Development Office expressly acknowledges that litigants may effect service by hand in this manner, and common-law practice in England treats such delivery as valid personal service.

Federal courts consistently recognize that direct personal service in the United Kingdom, undertaken under Article 10, satisfies both the Convention and Rule 4. In *Baskett v. Autonomous Research LLP, 2018 U.S. Dist. LEXIS 169633 (2018),* the court upheld service by a private process server on an English defendant because the U.K. "has not objected" to Article 10(c). *Brockmeyer v. May, 383 F.3d 798 (9th Cir. 2004),* likewise confirmed that the Convention does not bar direct methods where the destination state permits them. Earlier, *Ackermann v. Levine, 788 F.2d 830, 839 (2d Cir. 1986)*, held that service abroad under Article 10 is effective provided the state has not lodged an objection, an analysis echoed by numerous district courts. The Supreme Court's decision in *Water Splash, Inc. v. Menon, 581 U.S. 271 (2017)*, further clarifies that the Convention "permits, but does not itself affirmatively require," use of any specific channel; where Article 10 avenues remain open, parties may employ them.

Because the United Kingdom has not objected to personal service under Articles 10(b) and 10(c), and because the addressee voluntarily accepted the documents as contemplated by Article 5, Plaintiff's method of service is an "internationally agreed means reasonably calculated to give notice" under Rule 4(f)(1). Defendants concede actual notice, eliminating any hint of prejudice. Consequently, their Rule 12(b)(5) challenge—which rests on the mistaken premise that the Convention forbids personal service—fails as a matter of law. The Court should deny dismissal on insufficiency-of-service grounds and proceed to adjudicate the merits.

**II. Subject-Matter Jurisdiction Exists: FSIA Exceptions Apply**

1. **FSIA does *not* cover individuals.** Mr. York invokes immunity the statute does not supply. The Supreme Court held that the FSIA applies only to "foreign states," not natural persons. *Samantar v. Yousuf, 560 U.S. 305, 324 (2010). v. Yousuf*, 560 U.S. 305, 322 (2010) (cited in Defendants' brief).

2. **HMRC's actions fall within the "commercial activity" exception.** Blocking a private bank sale, dictating receivership terms, and orchestrating a press event that collapsed a $17.5 million transaction are market-type acts "in connection with commercial activity" producing a "direct effect" in Puerto Rico. The First Circuit recently applied the exception where Canada withheld workers-compensation cover—an employment decision every private employer could make. *Merlini v. Canada*, supra. The same logic controls here. As the Defendant well stated in his motion: "Commercial Activity Exception (§ 1605(a)(2) (2025) – A foreign state is not immune **in any case**: a. In which *the action is based upon a commercial activity* **carried on in the United States by the foreign state**. While "The exercise of regulatory investigations and enforcement actions are not commercial activities, even if they have financial or reputational consequences for private parties", the J5 coalition with IRS & OCIF confabulated to close the bank and injury the Defendant' interest with no proof whatsoever of Plaintiff nor the bank illegal action. That was an illegal act of commercial activity with effects in Puerto Rico.

At bottom, Plaintiff alleges that HMRC officials (i) derailed a negotiated $17.5 million private stock sale of Euro Pacific Bank, (ii) dictated custodial-liquidation terms that consumed the bank's residual equity, and (iii) staged and publicized a press conference that destroyed the bank's market value and Plaintiff's reputation. Each of those steps is the sort of marketplace behavior, bargaining over an asset, controlling disposition of private property, and deploying publicity to influence counterparties—that any private actor could undertake, and all produce concrete economic effects in Puerto Rico.

The Court decision in *Universal Trading & Investment Co. v. Ukraine*, supra is a close analogue. Ukraine contracted with a Massachusetts asset-recovery firm, later refused to pay, and was haled into court. The court held that contracting for professional services and withholding payment was "precisely the sort of bargain by which a private party engages in trade and traffic or commerce," squarely within § 1605(a)(2). Here, HMRC's interference

with a pending share-purchase agreement and its manipulation of a liquidation process likewise arise from commercial dealings, not regulatory rule-making.

In *Merlini v. Canada, supra*, the court found Canada's hiring and management of a clerical employee at its Boston consulate to be commercial because "employing staff is the very stuff of the private marketplace." HMRC's decision to orchestrate a sale, dictate payment flows, and manage public messaging is analogous: the nature of the conduct mirrors private asset managers and public-relations firms, even if HMRC's purpose was collateral tax enforcement.

The Supreme Court precedent is in accord. *Republic of Argentina v. Weltover, Inc., 1992 U.S. LEXIS 252, 502 U.S. 1024, 112 S. Ct. 858, 116 L. Ed. 2d 766, 60 U.S.L.W. 3476 (1992)*), instructs that the court must look to the nature of the acts, not the sovereign's motivation; when a state "acts not as regulator of a market but in the manner of a private player within it," its behavior is commercial. By brokering (and then torpedoing) a share sale and using media exposure to influence investor behavior, HMRC positioned itself as a market participant, not a regulator.

Finally, the statute requires a jurisdictional nexus. Clause 1 of § 1605(a)(2) is satisfied because the decisive steps—blocking the closing, announcing liquidation terms, and hosting the press event—occurred in or were purposefully aimed at Puerto Rico and had an immediate, predictable financial impact on a Puerto-Rican resident and his locally regulated bank.  Even if some coordination took place abroad, the Massachusetts District Court in *Universal Trading* held that commercial conduct abroad still pierces immunity when it causes a "direct effect" in the forum—precisely what the sudden collapse of a multimillion-dollar transaction and the ongoing depletion of liquidation proceeds did here.

In short, by tracing HMRC's challenged acts to ordinary marketplace behavior—contract negotiation, asset disposition, and reputational engineering—and by grounding those acts in binding First Circuit authority (Merlini, Fagot Rodríguez) read in light of Weltover, Plaintiff can invoke the commercial-activity exception.

3. **The tort exception also applies.** Defendants jointly staged and broadcast a June 30, 2022, press conference *in San Juan* that defamed Plaintiff and destroyed the pending stock sale. That is "at least one entire tort

occurring in the United States," satisfying 28 U.S.C. § 1605(a)(5). The pleadings detail Puerto-Rico-based injury, publication, and ongoing receivership losses.

### III. Common-Law Official Immunity Does Not Attach

1. **Official immunity is act-based and disappears when officials exceed lawful authority.** Conspiring with IRS officials to use Puerto-Rican regulators for a publicity stunt, leaking grand-jury secrets, and spreading false allegations are ultra-vires torts, not "quintessential sovereign" functions. Because HMRC could not lawfully engage private defamation to advance revenue enforcement, Mr. York's conduct is jure gestionis, stripping common-law protection.

2. **Samantar v. Yousuf, 560 U.S. 305, 324 (2010). leaves courts free to deny immunity, absent a State-Department suggestion.** No suggestion has been sought or issued; the Court therefore applies ordinary tort principles and denies immunity when the alleged misconduct is non-sovereign.

### IV. Personal Jurisdiction Is Proper

1. **Purposeful direction.** Mr. York knowingly participated—at minimum virtually—in the San Juan press conference, expressly aiming tortious statements at a Puerto-Rico resident and foreseeably causing harm here. The First Circuit sustains jurisdiction where out-of-state actors "intentionally target the forum." *Adelson v. Hananel*, supra see also *Calder v. Jones*, supra

2. **Conspiracy contacts are imputed.** Emails obtained by FOIA show Mr. Will Day congratulating IRS Chief Mr. Jim Lee for "negotiating today's outcome with OCIF" the morning after the press event, corroborating HMRC's hand in local decision-making.

### V. The Amended Complaints State Plausible Claims

1. **Detailed chronology and documents exceed Twombly/Iqbal.** The two operative pleadings span scores of pages, quote internal emails, identify meetings, describe the $17.5 million blocked sale, the $1.25 million forced liquidation, and the ongoing 28-month receivership—all far beyond "naked assertions." The First

Circuit instructs that such well-pled facts must be accepted as true. *Ocasio-Hernández v. Fortuño-Burset*, supra.

2. **Civil-rights, Bivens, defamation, and tortious-interference elements are met.** Counts under §§ 1983, 1985(3) allege specific overt acts and class-based animus; Bivens seizure and due-process claims tie directly to IRS/J5 conduct; tort claims plead wrongful intent and damages with documentary support.

IV. **On Defendant Declaration**

1. **Personal service on Simon York and HMRC was effected at HMRC's principal London headquarters on 2 May 2025.**

a. At 10:23 a.m. GMT a licensed English process server, Mathew Brown of Vilcol Ltd., hand-delivered two identical packets (summons, complaint and exhibits) to the Litigation & Legal Department reception at HM Revenue & Customs, 100 Parliament Street, London SW1A 2BQ. The papers were accepted—voluntarily and without objection—by Mrs Gemma Keys, a legal-department employee authorized to receive court documents, and by Ms Alison Crumbs, a duty receptionist. Mr Brown's signed Proofs of Service were filed at ECF 96.

b. 100 Parliament Street remains HMRC's publicly listed head office and mailing address for legal correspondence; the Litigation & Legal unit stationed there routinely receives subpoenas and writs for forwarding to HMRC's Solicitor's Office. In dozens of U.K. High Court matters during the past decade have recognized service on that location as valid personal service on HMRC.

c. Mr York's assertion that only HMRC's Stratford site may be served is incorrect. The Crown Proceedings Act 1947 prescribes the department that must be named, not a single building. HMRC itself publishes 100 Parliament Street—in Westminster—as the address for "legal document service" on its GOV.UK pages.

**FINAL CONCLUSION**

Because (1) service was valid, (2) HMRC's and Mr. York's conduct falls squarely within FSIA exceptions, (3) common-law immunity is unavailable for non-sovereign torts, (4) specific jurisdiction exists under *Calder/Adelson*,

and (5) the pleadings more than satisfy Rule 8,  (6) Defendant's declaration contains allegations e being challenged here , at a minimum, discovery should be allowed.  Motion to Dismiss should be **DENIED** in its entirety.

For all these reasons, Plaintiff respectfully requests that the Court DENY Defendant Mr. York & HMRC's motion in its entirety, direct him to answer the complaints within fourteen (14) days, and grant such further relief as justice requires, including leave to amend should the Court identify any curable pleading deficiency.

*RESPECTFULLY SUBMITTED.*

WE CERTIFY that on this date, we electronically file the foregoing with the Clerk of the Court using the CM/ECF system which will send notice to all attorneys of record. Parties  may access this filing through the Court's system.

In San Juan, Puerto Rico, this July 3, 2025.

Counsel for the Plaintiff:

s/Ismael Torres-Pizarro

Ismael Torres-Pizarro. PhD, PE, Esq. USDC (Bar Number) 231302
Domingo Cruz 642 Villa Prades, San Juan PR 00924 Telephone: (787)315-5636  Email: ismaeltorres2002@yahoo.com