IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| PETER DAVID SCHIFF<br><br>Plaintiff,<br><br>v.<br><br>INTERNAL REVENUE SERVICE (IRS) et al.,<br><br>Defendants, | CIVIL NO. 24-01511<br><br><br><br>TRIAL BY JURY DEMANDED |

WIGBERTO LUGO, in his capacity as Trustee for Euro Pacific International Bank.

QENTA, INC.

OFFICE OF THE COMMISSIONER OF FINANCIAL INSTITUTIONS OF PUERTO RICO.

INTERNAL REVENUE SERVICE; and

[OTHER DEFENDANTS],

Defendants.

**Emergency Motion for Temporary Restraining Order and Preliminary Injunction**

**(With Incorporated Memorandum of Law and Proposed Temporary Restraining Order)**

**I. Introduction**

Plaintiff **Peter D. Schiff** moves for an **emergency temporary restraining order (TRO)** and **preliminary injunction** to prevent the dissipation of approximately **$80 million in assets** – including over **$50 million in physical precious metals** – that were transferred to Defendant **Qenta, Inc.** under a now-terminated Purchase and Assumption Agreement ("P&A Agreement"). These assets rightfully belong to the receivership estate of Euro Pacific International Bank ("EPB") and its customers, yet Qenta has **refused to return them** following its unilateral termination of the P&A Agreement. Immediate injunctive relief is necessary to **preserve the status quo**, protect EPB's customers from

1

irreparable loss, and ensure these assets are not sold, transferred, or squandered before the Court can adjudicate the parties' rights.

In this combined motion, the Plaintiff sets forth the factual grounds demonstrating Qenta's wrongful retention of EPB's assets and the imminent risk of irreparable harm. The plaintiff also details why the legal standards for a TRO and preliminary injunction are satisfied under **Fed. R. Civ. P. 65** and the four-factor test of *Winter* and First Circuit precedent. Plaintiff seeks an order (1) **freezing all assets** that were transferred to Qenta under the failed P&A Agreement; (2) compelling a **full accounting** of those assets; (3) **barring any misleading communications** to EPB's customers regarding those assets; (4) **requiring segregation** of all EPB customer assets in Qenta's possession; and (5) permitting **expedited discovery** to uncover the status and location of the assets. Given the strong public interest in safeguarding depositor assets and the minimal risk of harm to Defendants from merely preserving assets that are not rightfully theirs, Plaintiff further requests that the Court **waive any security bond** requirement under Rule 65(c).

For the reasons below, Plaintiff has a high likelihood of success on the merits, will suffer irreparable harm absent injunctive relief, and meets all other criteria for emergency relief. The Plaintiff respectfully urges the Court to **grant this motion** and enter the proposed Temporary Restraining Order set forth at the conclusion of this motion, followed by a preliminary injunction after hearing, to prevent grave injustice and protect the public interest.

**II. Factual Background**

**A. The Purchase and Assumption Agreement and Its Termination**

On September 20, 2022, while EPB was in an OCIF-supervised receivership, **Qenta, Inc.** (along with its affiliates **G-Commerce DMCC** and **Responsible Gold Trading DMCC**) entered into a Purchase and Assumption Agreement with Plaintiff Peter Schiff (on behalf of EPB and himself). Under this P&A Agreement, Qenta agreed to assume all of EPB's customer deposit liabilities (including cash deposits and precious metals holdings) and acquire certain of EPB's assets. The purchase price was **$1.25 million**, and Qenta paid a **$500,000 deposit** up front. Critically, the P&A Agreement required that in the event the transaction was not completed, it would be unwound: Qenta's deposit would be returned and **Qenta would return all the assets and liabilities it had assumed from EPB**.

For some time after signing, Qenta effectively took **custody and control of EPB's assets and accounts** in anticipation of migrating EPB's customers to Qenta's platform. In particular, Qenta took possession of over **$77 million** of EPB's assets, consisting of roughly **$19 million in cash** and **$58 million in non-cash assets** (including over **$50 million in physical gold and silver bullion**, plus various mutual fund holdings). These assets correspond to the deposits and precious metal holdings of EPB's customers who had opted into the transfer. During this interim period, however, Qenta failed to complete the promised customer migration and did not finalize the transaction.

Ultimately, on **July 11, 2025**, Qenta **unilaterally terminated** the P&A Agreement, walking away from the deal just as it was nearing completion. The termination of the Agreement triggered Qenta's contractual obligation to **reverse the transfer** and promptly return **all EPB assets and liabilities back to the receivership** (in exchange for return of its $500k deposit). In other words, once Qenta canceled the deal, it had **no lawful claim to keep any of EPB's assets** – its sole entitlement was a refund of the $500,000 deposit it had paid.

B. Qenta's Refusal to Return ~$80 million in EPB Assets and Proposed "Discount" Scheme

Despite the clear unwinding obligations, **Qenta has flatly refused to return the assets** it received. Qenta has acknowledged that it is currently holding **at least $19 million in cash and $58 million in non-cash assets** belonging to EPB. Yet rather than transferring these assets back, Qenta proposed a self-serving arrangement: Qenta offered to **liquidate all the assets and remit cash proceeds to the receivership based on the assets' September 30, 2022, values** – **not** their current market value – and only on the condition that the bank agree to an additional **$13 million "discount"**. Qenta's proposed discount would allow it to **unjustly retain approximately $40 million** of EPB's assets for itself. Specifically, Qenta's "offer" demanded: an arbitrary **$5 million termination fee** payable to Qenta, a $400,000 allowance for winding up certain acquired subsidiaries, retention of the $500,000 deposit, and retention of roughly $7 million in mutual fund assets. By imposing these terms, Qenta sought to keep roughly half of the precious metals and other asset value it was holding – effectively **paying the receivership only about 50 cents on the dollar** for the assets while pocketing the rest.

If the OCIF-appointed receiver (Trustee **Wigberto Lugo**) were to accept Qenta's outrageous proposal, the impact on EPB's depositors would be devastating. Instead of having approximately **$125 million** in liquid assets

3

available to repay the bank's customers (the expected value if Qenta simply returned everything as required), the receiver would have only about **$85 million** – a shortfall of **$40 million**. The **biggest losers** would be those customers who held their deposits in precious metals, because Qenta's scheme specifically targets the metals (proposing to sell the gold and silver and keep half the proceeds). In short, Qenta is attempting to **unjustly enrich itself** at the direct expense of EPB's customers, leveraging its current possession of the assets to hold them "hostage" unless its demands are met.

Qenta's only purported justification for this blatant breach of the P&A unwinding terms is that it allegedly incurred some damage or costs due to delays in the transaction. But even if Qenta had colorable claims (which it does not), the P&A Agreement provides a specific forum for resolving any disputes: **binding arbitration in New York**. Nothing in the Agreement permits Qenta to engage in self-help by unilaterally keeping EPB's assets. Indeed, the facts overwhelmingly indicate that **Qenta, not EPB or the receiver, is the party in breach** – Qenta failed to perform and terminated the deal and is now **liable to indemnify the bank for any losses**, not vice versa. Qenta's attempt to compel a "settlement" on grossly unfair terms while holding depositor assets hostage has no legal basis and will not withstand scrutiny.

**C. No EPB Customers Were Ever Migrated to Qenta – Assets and Liabilities Remain with EPB**

Crucially, because the P&A Agreement was never consummated to completion, **none of EPB's customers migrated to Qenta's platform**. All of the so-called "opt-in" customers who agreed to transition to Qenta remained, **and still remain, customers of EPB**. The entire purpose of the P&A Agreement was for Qenta to assume the bank's customer relationships along with their assets and corresponding liabilities to customers; this never occurred. Thus, from a legal and regulatory standpoint, **the deposit liabilities to those customers are still obligations of EPB**, and the corresponding assets (cash and precious metals) are **still assets of EPB's receivership estate**. Qenta at no point obtained any ownership of the assets or any novation of the customer accounts – it was merely holding the assets in custodial capacity pending final approval of the sale.

With the termination of the Agreement on July 11, 2025, the situation has reverted entirely to the **status quo ante** – except that Qenta is improperly refusing to relinquish custody of the assets. In other words, **Qenta right**

4

**now is holding assets that belong to EPB (and ultimately to EPB's customers)**, without any lawful authority, and is preventing the court-appointed receiver from securing and distributing those assets to satisfy customer claims. By doing so, Qenta is effectively **impeding the receivership and liquidation process** that OCIF put in place to protect depositors.

### D. Trustee Lugo's Abdication of Duty and Misleading Statements to Customers

Defendant **Wigberto Lugo**, the trustee appointed by OCIF to oversee EPB's receivership, has thus far **failed to take effective action** to recover the assets from Qenta. In fact, Mr. Lugo has **mistakenly stated** to at least one concerned customer that the ~$50 million in gold and silver being held by Qenta is "not part of the liquidation process" he is administering. He even advised that customer to seek legal recourse directly against Qenta, as if the matter were entirely outside the bank's estate. This position is **completely contrary to the facts and Mr. Lugo's duties**: because the P&A Agreement was terminated, those precious metals *are* assets of the bank's estate, and the corresponding customer deposits (claims for that metal) remain liabilities of the bank. The trustee has a fiduciary obligation to safeguard *all* of the bank's assets for the benefit of customers and creditors. By suggesting that the metals in Qenta's possession are not under his purview, Trustee Lugo is effectively **disclaiming responsibility for the single largest asset pool of the bank**. If uncorrected, this abdication could result in a massive loss to EPB's customers. Indeed, if the trustee were to accede to Qenta's proposed discount deal (allowing Qenta to keep roughly half the assets), he would be violating his duty and exposing both himself and OCIF to substantial liability for **gross negligence**.

Plaintiff has repeatedly **alerted Trustee Lugo and OCIF** to the dire consequences of Qenta's proposal and the necessity of recovering the assets in full. Those warnings have so far gone unheeded. Lugo's inaction and his misleading communications have only heightened the urgency of judicial intervention. At this point, it appears the trustee **may be inclined to "cut a deal" with Qenta** or simply remain passive, rather than aggressively moving to freeze and reclaim the assets. Given that possibility, Plaintiff (who as EPB's owner has a residual interest and potential personal exposure) has no choice but to seek immediate relief from this Court to **protect the bank's customers** and prevent an irreversible dissipation of assets.

### E. Qenta's Affiliates' Operational Collapse and Inability to Perform

Another key factual development underlying this motion is the **operational and financial collapse of Qenta's relevant subsidiaries**, which further demonstrates the *urgent need to safeguard the assets* now. Qenta's ability to perform the P&A Agreement and service EPB's customers was predicated on its network of affiliate companies. Yet since 2022, several of these entities have become **insolvent, defunct, or otherwise incapable of performing**:

- **G-Commerce DMCC** – the Dubai-based entity that Qenta designated to onboard EPB's customers and assume their deposit and precious metals obligations – **allowed its business license to expire in October 2023**. G-Commerce is now **in the process of winding down** and has effectively ceased business operations. This means that even if the P&A had not been terminated, Qenta's main vehicle for holding customer deposits and metals was no longer functional. The expiration of G-Commerce's license and its **failure to maintain regulatory good standing** constitute a **material breach** of Qenta's representations and warranties in the Agreement. It renders Qenta **incapable of performing** its obligations to EPB's customers, and calls into question what has happened to the assets that were supposed to be held by G-Commerce on Qenta's behalf.

- **G Mint Sàrl (Switzerland)** – a Swiss affiliate involved in Qenta's digital gold operations (and apparently a crucial part of Qenta's vaulting or "G-Coin" custodial arrangements) – **fell into bankruptcy in 2024 and was formally deleted from the Swiss corporate registry**. G Mint was supposed to serve as a *bailee* for precious metals under Qenta's structure; its collapse indicates that Qenta **"never would have been able to actually service clients"** under the agreement or had no intention to do so. This again underscores Qenta's inability to securely manage the gold and silver assets at issue. If the metals are in a vault tied to G Mint or a related entity, there is a serious risk they could be caught up in insolvency proceedings or otherwise out of Qenta's immediate control, heightening the risk of loss.

- **Euro Pacific Card Services Ltd** – one of the four corporate subsidiaries of EPB that Qenta agreed to assume in the sale – was **dissolved via compulsory strike-off in the United Kingdom in May 2023**. This is an example of Qenta taking over an EPB subsidiary and then allowing it to be struck off, suggesting neglect or an inability to maintain the businesses it acquired. While Card Services Ltd (which handled a credit card program) is not directly

related to the precious metals, its dissolution illustrates the broader pattern of Qenta's mismanagement and breach of expectations under the P&A Agreement.

- **Responsible Gold Trading DMCC**, another Dubai affiliate of Qenta, *reportedly remains active* as of mid-2025. However, the failure of the other entities (especially G-Commerce and G Mint) effectively means Qenta **no longer has the infrastructure or licensing to carry out banking or precious metal custody services** for EPB's customers. In short, Qenta's corporate structure has largely **disintegrated**, and it appears to be **operationally incapable** of fulfilling the role it promised. This collapse was likely a significant factor in Qenta's decision to terminate the deal.

The above facts are important for two reasons. First, they make clear that Qenta has **no legitimate path to keep or use EPB's assets** – its attempt to retain the assets is purely opportunistic, not tied to any ongoing service to the customers (which it cannot provide). Second, the disarray in Qenta's organization creates a heightened risk that the assets (especially the precious metals) could be moved, commingled, or claimed by third parties (such as creditors or foreign authorities) if immediate action is not taken. Every day that these assets remain in Qenta's hands is a day of uncertainty for EPB's customers and increases the chance that the assets could slip away. This is the textbook definition of a situation warranting emergency injunctive relief.

**F. Involvement of OCIF and IRS**

Defendants **OCIF** (Puerto Rico's Office of the Commissioner of Financial Institutions) and the **Internal Revenue Service (IRS)** are named in this action because of their roles in precipitating this crisis and their potential influence over the assets. OCIF oversaw EPB's receivership and installed Trustee Lugo; it has the power to direct or replace the trustee and to enforce the banking laws of Puerto Rico. The IRS (along with other international regulators) was involved in the joint investigation "Operation Atlantis" that led to the shutdown of EPB in 2022, and IRS officials coordinated with OCIF regarding the bank's closure and the attempted sale to Qenta. Plaintiff alleges that IRS and OCIF effectively **engineered the forced sale of EPB's assets to Qenta for a nominal sum** (blocking a prior, more favorable sale). While those underlying allegations are being pursued in a civil rights lawsuit, the immediate relevance here is that **OCIF and IRS have been closely involved in EPB's fate**. To the extent either OCIF or IRS (or their agents)

might take or encourage any action that could further dissipate or encumber the assets at issue (for example, approving an inadequate settlement or asserting a claim to the assets), they too must be **restrained by this Court**. The injunctive relief sought will thus include all Defendants and anyone acting in concert with them, to ensure **no loopholes or end-runs** undermine the asset freeze.

In sum, the factual record establishes: (1) Plaintiff's bank (EPB) entered into an agreement with Qenta to protect customers, but Qenta walked away and is wrongfully holding ~$80M of the bank's assets; (2) Qenta has explicitly threatened to keep half of those assets unless paid off, which would rob customers of $40M; (3) the bank's regulator-appointed trustee has failed to secure these assets and even misstated his responsibility, necessitating Plaintiff's intervention; and (4) Qenta's own affiliates' failures underscore the urgent risk of irreparable loss. Plaintiff now turns to the legal standards for relief, all of which are amply satisfied here.

### III. Legal Standard

**Federal Rule of Civil Procedure 65** authorizes this Court to issue temporary restraining orders and preliminary injunctions to prevent immediate, irreparable harm. A TRO may be granted **without advance notice to the opposing party** if specific facts clearly show that immediate and irreparable injury will result before the defendants can be heard, and the movant's attorney certifies any efforts made to give notice. Here, Plaintiff has provided notice to the extent feasible and seeks a TRO given the urgency and the risk that delay could allow Defendants to further dissipate assets.

Whether issued ex parte or after a hearing on short notice, a TRO is governed by the same four-factor test as a preliminary injunction. Under well-established Supreme Court precedent, **"[a] plaintiff seeking a preliminary injunction must establish** [1] **that he is likely to succeed on the merits**, [2] **that he is likely to suffer irreparable harm** in the absence of preliminary relief, [3] **that the balance of equities tips in his favor**, and [4] that an injunction is in the public interest.". The First Circuit applies these same four factors when evaluating motions for preliminary injunctions or TROs. All four factors must be weighed, but the likelihood of success on the merits and irreparable harm are often considered the most critical; a failure to show irreparable harm, for example, will typically preclude

relief. No single factor is dispositive, however, and the Court must consider the overall balance of equities and the public consequences of granting or denying the injunction.

Additionally, Rule 65(c) provides that the Court may require the movant to give **security (a bond)** in an amount the Court deems proper, to pay the costs and damages sustained by any party found to have been wrongfully enjoined. The amount of the bond (if any) is within the Court's discretion, and courts in the First Circuit and elsewhere **often dispense with or require only a nominal bond in cases implicating important public interests or fundamental rights**. As discussed below, this case falls squarely in that category, and Plaintiff requests that the bond requirement be waived.

Plaintiff now addresses each of the four *Winter* factors in turn, as well as the bond issue, to demonstrate why the extraordinary remedy of a TRO and preliminary injunction is not only justified but absolutely necessary in this case.

## IV. Argument

### A. Likelihood of Success on the Merits

Plaintiff can demonstrate a strong likelihood of success on the merits of his claims. The core merits question here is whether Qenta (and those acting in concert with Qenta) have any legal right to retain EPB's assets in the wake of the terminated P&A Agreement. The answer is clearly **no**. The P&A Agreement's terms – which will be proven through documentation and testimony – unambiguously required Qenta to return all assets to the bank upon termination. Qenta's refusal to do so is a straightforward **breach of contract** (indeed, a material breach of the termination clause). Furthermore, Qenta's attempt to coerce a settlement by withholding the assets likely constitutes **conversion** and a breach of fiduciary duty (to the extent one was assumed during the interim management of customer accounts). Qenta's own communications acknowledge it is holding ~$77 million of assets that are not its property, which by itself establishes the wrongful possession.

Plaintiff (on behalf of EPB or its customers) is entitled to the **immediate return of those assets**. In any arbitration or litigation on the contract, the law will entitle the non-breaching party (the EPB side) to rescission of the transaction and restitution of the assets, while Qenta would at most get back its deposit. Qenta's thin

9

justifications – e.g., that it incurred expenses, or that regulatory delays harmed it – do not provide any lawful excuse for its conduct. At best, Qenta could present those as **damages claims in arbitration**, but it cannot unilaterally declare itself the victor and seize $40 million as "self-help" compensation. In fact, by terminating the contract and refusing to return assets, Qenta has exposed itself to liability for damages to the bank. These merits issues are not close: on the clear contractual documents and facts, Plaintiff's right to the return of the assets (and to enjoin their dissipation in the meantime) will prevail.

Additionally, to the extent Plaintiff's motion encompasses defendants like Trustee Lugo, OCIF, and the IRS, Plaintiff is also likely to succeed in showing their actions (or inaction) violate the law. Trustee Lugo has a **statutory and fiduciary duty** under Puerto Rico law to marshal and protect EPB's assets for the benefit of creditors (which include depositors). By even considering allowing Qenta to keep assets, or by failing to act to reclaim them, he is violating those duties. OCIF, as the agency in charge, similarly would be violating its mandate to ensure an orderly, fair liquidation. And if IRS agents are found to be influencing these events (as alleged in Plaintiff's civil rights claims), Plaintiff is likely to establish constitutional and tort violations by those officials. While these aspects involve fact-intensive issues, the immediate relief sought is primarily about **enforcing the contract and property rights**, which is straightforward. The Plaintiff's likelihood of success on the contract and property claims is extremely high.

Finally, any possible defenses the Defendants might raise are unavailing. Qenta cannot claim "irreparable harm" to itself or any equitable excuse – it is a money dispute of Qenta's own making, and the contract provides a forum for that (arbitration) which Qenta has bypassed. Nor can Qenta claim the assets are not EPB's – its own admissions contradict that. The trustee and OCIF similarly have no defense for not securing assets that indisputably belong to the bank. In short, Plaintiff is more than likely to prevail on the merits and obtain a final injunction or order requiring return of the assets. Therefore, this first and most crucial factor weighs decisively in Plaintiff's favor.

**B. Irreparable Harm Absent Injunctive Relief**

Plaintiff – and, critically, the **hundreds of customers of EPB** whose deposits are at stake – will suffer immediate and **irreparable harm** if a TRO is not issued. The harm is the potential **permanent loss of $80 million in assets**, including precious metals that many customers specifically chose to hold (likely as a hedge or for personal

reasons). If Qenta is not restrained, it could **transfer, sell, encumber, or hide these assets at any moment**, leaving nothing for customers to recover.

Also, If Euro Pacific Bank customers suffer heavy losses, the Plaintiff could have personal liability. The Plaintiff will most certainly suffer reputational harm, which is important to his livelihood. Plaintiff is still active in the financial services and gold industry and having so many of his customers lose money could damage his brand and the goodwill he has with his other clients and customers, and the public at large, that may become clients or customers in the future.

**Monetary losses can constitute irreparable harm** when the party liable is unlikely or unable to satisfy a judgment, or when the loss cannot be adequately compensated after the fact. Here, we have both situations: Qenta's own instability (demonstrated by the collapse of its affiliates) raises serious doubt that it could ever pay a money judgment for $80 million. If Qenta is allowed to liquidate the metals and disperse the proceeds (especially under a claim that some of it belongs to Qenta), those funds may **vanish or move overseas**, effectively placing them beyond the reach of this Court and any arbitral award or judgment. Courts recognize that the **dissipation of assets** which would otherwise be used to satisfy creditors or claimants can **constitute irreparable harm**, because once dissipated, the assets are "likely unrecoverable", and any eventual judgment becomes effectively worthless. In an SEC enforcement context, for example, the Fifth Circuit noted that if assets are distributed or hidden, defrauded investors would have no recovery, thus injunctions and receiverships are appropriate to prevent such irreparable harm. The same logic applies here to EPB's depositors.

Furthermore, these assets are not just generic funds – they include **physical gold and silver bullion** that, must be returned to the bank in the form that they were received. Many EPB customers entrusted their precious metals to the bank's vaults; if those metals are sold off, the customers have lost the very investment and safety asset they chose, beyond just the dollar value. Being forced to take a cash payment at some historic price (as Qenta proposes) is no remedy; it deprives them of property and the opportunity to benefit from the actual market value of their holdings. This kind of loss – losing precious metals holdings in specie – is not readily compensable with money damages, especially under the constrained terms Qenta seeks to impose.

Time is of the essence. With each day, the risk grows that Qenta will take unilateral action. Qenta has already threatened to **liquidate the metals** (indeed, it purportedly wants to sell them and only send half the proceeds to the receiver). If not enjoined, Qenta might attempt to do this, or move the metals to another jurisdiction or a different entity (perhaps to secure loans or satisfy other debts). Such actions could be irreversible. For instance, if gold bars are sold to third-party buyers, **those specific bars cannot be traced or recovered**; the bank and its customers would be left only with a claim for money against Qenta – a claim that could be worthless if Qenta has distributed or lost the money.

Plaintiff just learned that after the physical gold that was transferred to Brinks in Switzerland was already sold. However, it was converted to "paper gold" with a Swiss Bank as a counter party. So, all the appreciation is locked in. The contract can be liquidated and the current value sent to the bank. The physical silver is still at Silver Bullion in Singapore. The Truste should have figured this out over a year ago.  He failed in his fiduciary duty to Opt-in customers, who were never onboarded to Qenta. The only reason Qenta escalated this is because the Plaintiff started asking questions and threatened legal action.

Why it's an emergency now to freeze the gold, given that it's been there for two years?, it's that now Qenta knows that the Plaintiff on to them, so they are taking action with a request to the Trustee, by, what the Plaintiff alleges here, is a misrepresentation of the value of the precious metals and mutual funds, and questionable losses that he insisted the bank must  pay him.

Importantly, the trustee's current stance exacerbates potential harm. By telling customers that the assets are not under his protection, he is effectively leaving it to those individual customers to fend for themselves. That invites a chaotic race: some customers might try to sue Qenta or grab assets, leading to piecemeal distribution. Others might be misled into believing all is lost and fail to act. The overall result would be **fragmentation and likely dissipation of the assets**, with unequal and unfair outcomes. Only a unified injunction from this Court can halt that downward spiral and preserve the assets intact for orderly resolution.

In summary, without a TRO, Plaintiff and EPB's customers face irreparable harm in multiple forms: (1) the potential **permanent loss** of tens of millions of dollars, which is irreparable especially given Qenta's dubious ability

to pay; (2) the **loss of unique precious metal assets** in kind, which cannot be fully compensated by later monetary relief; (3) the **violation of constitutional and statutory rights** (if the assets are lost due to the actions of state actors like OCIF or collusion by IRS agents, that implicates due process and other rights, the infringement of which is irreparable per se); and (4) the **significant delay in returning funds to innocent customers**, who have already waited years to get their money back – further delay itself, and the anxiety and hardship it brings, is an intangible harm not fixable after the fact.

The irreparable harm factor is unquestionably satisfied here. Indeed, the very purpose of a TRO is to prevent exactly this scenario: a one-time transfer or dissipation of assets that would **defeat the Court's ability to render meaningful relief later**. If the Court does not act now, there may be no assets left to fight over by the time the normal litigation process concludes. Plaintiff has demonstrated far more than a mere possibility of harm – it is **likely** to occur absent intervention, and it would be catastrophic to the public interest and to Plaintiff's rights. This factor strongly supports issuing the TRO.

**C. Balance of Equities**

The balance of equities (or hardships) tilts heavily in Plaintiff's favor. In deciding whether to grant an injunction, the Court must weigh up the harm that the Plaintiff and the public will suffer without an injunction against any harm that the Defendants would suffer if the injunction were issued. Here, Plaintiff's potential harm – as described – is the **massive loss of assets and violation of legal duties to customers**, which is grave and irreparable. By contrast, what hardship would Defendants suffer from an injunction? **None is legally cognizable.**

An asset-freeze TRO would simply require Qenta and the other Defendants to **do nothing more than preserve the status quo**. Qenta would be ordered not to transfer or dispose of assets that, in any event, **do not belong to Qenta**. Preventing a party from disposing of someone else's property is not a hardship – it is the minimal equitable expectation. Qenta cannot claim it needs to use those specific assets for its business; even if it did, that would be an illegitimate use of trust property. Qenta's only possible "harm" is that it is inconvenienced by not being able to leverage or liquidate the assets during the injunction period. But that is a self-inflicted predicament: Qenta agreed in the contract that these assets ultimately belong to the bank absent completion of the sale. Moreover, if

13

Qenta truly had a pressing need for cash or value, it can post its *own* assets or seek a proper legal remedy (like arbitrating its claims) – it has no right to use EPB's assets to finance itself. In short, **maintaining the status quo causes Qenta no legitimate harm**. It merely prevents wrongful action.

As for Trustee Lugo and OCIF, an injunction would actually **align with their duties**, not harm them. They would be ordered to ensure the assets are not dissipated – something they should be doing anyway. There is no hardship in compelling a receiver to follow the law and protect assets. If anything, the injunction shields the trustee and OCIF from potential liability by stopping them from making a costly mistake. The IRS similarly has no valid interest in these assets that would be impaired by an injunction; if the IRS had designs on them (for example, satisfying tax claims), it would still have to follow legal processes, and an injunction here would not prejudice those processes in the long run – it would just freeze the situation so that rights can be sorted out properly.

On the flip side, without an injunction, the hardship to Plaintiff and customers is enormous, as already detailed. The **equities strongly favor** preserving assets versus allowing a breach and potential unjust enrichment. Additionally, equity considers the parties' conduct: Plaintiff and the customers are **innocent parties** who simply want their property back. Qenta, in contrast, is in an inequitable posture, having breached a contract and holding assets hostage. Equity will not suffer a wrongdoer to profit from wrongdoing; thus, Qenta's hands are unclean in this matter.

It is also worth noting that granting the injunction is equitable because it essentially enforces what the contract already stipulates – that Qenta has no rightful claim to keep the assets. We are asking the Court to maintain that contractual and fiduciary equilibrium until a final resolution. If by some chance it is later determined that Qenta had a valid claim to part of the assets, the injunction will have simply delayed Qenta's access to them, which is a far lesser harm than the permanent loss customers would suffer if the injunction were wrongly denied.

In balancing hardships, courts sometimes also consider whether the injunction would cause any harm to third parties. Here, the injunction would actually benefit third-party customers by protecting their interests and would not adversely affect anyone else. No legitimate business or public function is hindered by telling Qenta "don't move that money or metal," or telling a trustee "Do not sign away assets for pennies." Conversely, not issuing the injunction could harm many third parties (the depositors).

Therefore, the scales of equity are decidedly one-sided in favor of Plaintiff. The relief sought is narrowly tailored to **prevent harm and preserve rights**, imposing at most a temporary restriction on Defendants that mirrors their pre-existing obligations. The balance of equities thus supports the issuance of the TRO.

### D. Public Interest

The public interest strongly favors granting the requested injunction. The public interest factor looks at the effects of the injunction on non-parties and on the broader public welfare. In cases involving the protection of consumers, investors, or depositors – especially where trust in the financial system is at stake – courts have found the public interest weighs in favor of injunctive relief to prevent misuse of funds.

Here, the public interest considerations include **protecting depositors and consumers from loss**, **upholding the integrity of banking regulations and receivership processes**, and **deterring misconduct by financial actors**. Puerto Rico, like any jurisdiction, has a strong public interest in ensuring that the assets of a failed bank are distributed fairly and according to law, and that no insider or third-party siphons value away. If Qenta were allowed to walk off with $40 million meant for EPB's customers, it would send a terrible message and erode public confidence in the resolution of financial institution insolvencies. Conversely, issuing the injunction will reinforce that the legal system will step in to protect consumers from irreparable harm and will enforce contracts and fiduciary duties strictly.

There is also a broader public interest in **seeing that regulatory actions are conducted transparently and without favoritism**. The plaintiff's underlying allegations (to be addressed in the broader case) suggest that the closure of EPB and the sale to Qenta were driven by certain government actors for ulterior motives. While those issues will be resolved in due course, at this juncture public interest is best served by **stopping any further damage stemming from that process**. Granting the injunction will preserve the status quo and ensure that if wrongdoing occurred, the victims are not further victimized by losing their assets.

Moreover, **preventing misleading communications** (one aspect of the relief requested) is firmly in the public interest. Customers deserve accurate information; an injunction prohibiting false or misleading statements by Defendants about the assets will help prevent panic or misinformation. The public (including the media and other stakeholders) also have an interest in truthful disclosures about what is occurring with this bank's liquidation.

The only conceivable argument on the other side might be Qenta claiming that an injunction could harm business interest (though as noted, none legitimate). Even if Qenta argued that freezing the assets could hurt its operations or reputation, the public interest in protecting consumers and enforcing contracts would outweigh any such private interest. **No public benefit exists in allowing a breaching party to use contested assets freely**. In fact, the public interest aligns with caution and preservation until rights are sorted out.

In sum, granting the TRO and preliminary injunction will uphold public trust in the rule of law, protect numerous individuals from harm, and signal that the courts will ensure accountability. The public interest factor thus emphatically favors the issuance of the requested relief.

**E. No Security Bond Should Be Required (Rule 65(c))**

Rule 65(c) gives the Court discretion to require the movant to post a security bond, but it is **"in such sum as the court deems proper."** In cases like this, courts often **waive the bond or set a nominal bond** because of the strong public interest at stake and the minimal risk of harm to the enjoined parties. This Court should do the same and **waive the bond requirement entirely** (or set a purely nominal bond of $1).

There are multiple reasons justifying no bond here. First, Defendants will not suffer financially from this injunction, as it simply preserves assets that should belong to Plaintiff or EPB's estate. **No damages will be incurred by Defendants due to compliance with the law**. Qenta has no legitimate expectation to earn profits off EPB's assets in the interim, so being enjoined causes it no monetary loss for which a bond would be needed.

Second, imposing a substantial bond would be inequitable to Plaintiff and the affected customers. Plaintiff is an individual who has already incurred great expense (and even personal exposure) trying to resolve this mess. Requiring a prohibitive bond could chill his ability to protect the public interest and enforce important rights, which is precisely why courts waive bonds in public-interest litigation. As the First Circuit observed in *Crowley v. Local No. 82*, rigidly requiring a high bond can unduly restrict the enforcement of federal rights – especially where plaintiffs have limited financial means and defendants are institutions better able to bear costs. Here, the balance of hardships and the nature of the case make a bond unnecessary.

Third, the public interest nature of this injunction cannot be overstated: we are talking about protecting depositors in a bank liquidation scenario, which implicates regulatory oversight and public confidence. Courts have recognized an exception to the bond requirement for injunctions sought to **enforce important public interests**. This case falls squarely within that rationale. Requiring a bond would serve no purpose except perhaps to give Defendants unwarranted leverage.

Finally, the Court can find that **the likelihood of harm to Defendants is so minimal** that a zero bond is "proper." If for some reason it later turns out the injunction was wrongful, the assets will still have been preserved – Qenta would not have lost them, just the opportunity to use them temporarily. That is not a compensable damage in need of a bond.

Accordingly, Plaintiff asks the Court to exercise its discretion to waive the Rule 65(c) security requirement due to the strong public-interest factors and the absence of any real potential damage to Defendants from this injunction. This approach will ensure that the injunctive relief is not thwarted by financial barriers and that the *status quo* can be maintained immediately.

**V. Conclusion**

For the foregoing reasons, Plaintiff respectfully requests that the Court **GRANT** this Emergency Motion. Specifically, Plaintiff asks that the Court issue a **Temporary Restraining Order, effective immediately**, followed by a preliminary injunction after a hearing, with the terms described herein. A proposed form of Temporary Restraining Order is included below for the Court's convenience, which incorporates the relief sought. Plaintiff further requests that the Court set this matter for a preliminary injunction hearing at the earliest practicable date and, after hearing, issue a preliminary injunction containing the same terms during the pendency of this case. Given the urgency and the public interest, Plaintiff also requests that the Court **waive any bond requirement** under Rule 65(c).

Plaintiff is prepared to provide any further evidence or argument as the Court requires. The plaintiff thanks the Court for its prompt attention to this critical matter.

*RESPECTFULLY SUBMITTED.*

WE CERTIFY that on this date, we electronically file the foregoing with the Clerk of the Court using the

CM/ECF system which will send notice to all attorneys of record. Parties may access this filing through the Court's system.

In San Juan, Puerto Rico, this fifth day of February 2025. Counsel for the Plaintiff:

s/Ismael Torres-Pizarro

Ismael Torres-Pizarro. PhD, PE, Esq. USDC (Bar Number) 231302
Domingo Cruz 642 Villa Prades, San Juan PR 00924 Telephone: (787)315-5636  Email: ismaeltorres2002@yahoo.com